CLARK, Justice.[1]
hWe granted a writ to determine the proper interpretation of La. R.S. 30:29 and whether Chevron USA Inc. should be dismissed from the suit.
FACTS AND PROCEDURAL HISTORY
The State of Louisiana and the Vermilion Parish School Board (collectively “School Board” or “plaintiffs”) filed a “Petition for Damages to School Lands” on September 2, 2004, seeking damages and remediation of a sixteenth section of property in Vermilion Parish owned by the State and managed by the Vermilion Parish School Board situated in the East White Lake Field. The property at issue was allegedly polluted by oil and gas exploration and production performed pursuant to an oil, gas and mineral lease originally granted on the property in 1935 and a surface lease entered into in 1994. The plaintiffs claim damage to the land’s soil, surface waters and ground waters.
| .¿The plaintiffs urge various causes of action in their petition including negligence, strict liability, unjust enrichment, trespass, breach of contract and violations of both the Mineral Code and the Civil Code. The plaintiffs seek money damages *1041 for a comprehensive evaluation of the contamination of the property, remediation of the property, diminution in the property’s value, mental anguish and inconvenience, as well as for both punitive and stigma damages.
Several defendants were named in the original petition and in supplemental and amending petitions as companies which conducted, directed, controlled or participated in various oil and gas exploration and production activities as operators and/or working interest owners, and/or joint venturers in the East White Lake Field. At the time of our review, the remaining defendants are Union Oil Company of California; Union Exploration Partners; Carrollton Resources, L.L.C.; Chevron USA Inc.; and Chevron Midcon-tinent, L.P.[2]
We are asked to review rulings of the trial court which arose in the context of summary judgments. A motion for partial summary judgment requires our interpretation of La. R.S. 30:29. In a motion for summary judgment, one of the defendants, Chevron USA Inc., seeks dismissal from suit.

Motion for Partial Summary Judgment

The facts concerning the motion for partial summary judgment are as follows. The provisions of La. R.S. 80:29, enacted as Act 312 in 2006, became effective on June 8, 2006.[3] Act 312 provides a procedure for the remediation of oilfield sites and exploration and production sites. In the School Board’s “Fourth Supplemental and Amending Petition for Damages,” filed after the effective date of the Act, the plaintiffs specifically alleged Act 312 applies to this case. The | «plaintiffs asserted damages awarded for remediation must be used, to the extent necessary under La. R.S. 30:29, for the purpose of funding the most feasible remediation plan adopted by the court. Plaintiffs alleged, damages awarded by the court for remediation would be used to clean up the contamination of the property at issue.
During discovery, Union Oil Company of California and Union Exploration Partners (collectively “Unocal”) admitted “environmental damage,” as defined by the statute, exists on the subject property and further admitted its responsibility under the provisions of La. R.S. 30:29(C). As a party admitting responsibility under Act 312, Unocal moved to refer the case to the Louisiana Department of Natural Resources (“La.DNR”) for determination of a plan for remediation, as required under the act. The plaintiffs objected, arguing such a referral could not take place until the finder of fact determined the responsibility of all of the defendants and adjudicated the private claims asserted by the plaintiffs. Although the trial court initially granted Unocal’s motion, the trial court ultimately granted the plaintiffs’ motion for new trial on this issue, rescinding its initial judgment and staying all proceedings before the La. DNR, Office of Conservation. The appellate court denied the defendants’ writ on this issue, concluding a reasonable time under the statute within which the trial court should order the Unocal defendants to submit a remediation plan to the La. DNR would be some time after liability and damages issues have been resolved regarding all of the defendants.[4] This court likewise denied the de *1042 fendants’ writ.[5]
Before this court’s action on its writ, the defendants filed a motion for partial summary judgment, asserting plaintiffs had no right to seek remediation damages |4in excess of those found necessary to fund the plan for remediation mandated under the statute to be determined by the court. The defendants argued Act 312 provided such “excess remediation damage” is allowed only under the terms of an express contractual provision. Since the 1935 oil, gas and mineral lease in this case did not include such an express provision, the defendants contended Act 312 acted as a substantive cap on remediation damages resulting from a tort or the implied restoration obligation of a mineral lease. After consideration of the plaintiffs’ opposition and discussion of the issue at several hearings, the trial court agreed with the defendants.
The School Board took a writ to the appellate court on this ruling, which was denied on the ground the ruling was a partial judgment which had not been certified as a final judgment. While the writ application was under consideration, the School Board filed a motion in the trial court seeking to have Act 312 declared unconstitutional as applied. The trial court denied this motion and the court of appeal likewise denied a writ, referencing the prior writ application on the same subject matter as a partial judgment and indicating the question of constitutionality could be rendered moot by a successful appeal of the prior ruling. Thereafter, the trial court’s rulings on the motion for partial summary judgment and the motion to have Act 312 declared unconstitutional were certified as final judgments, and the School Board lodged an appeal.

Motion for Summary Judgment

The following facts concern the motion for summary judgment. The School Board’s suit was filed in September, 2004. Chevron USA Inc. was named as an additional defendant as “successor to Union Oil Company of California,” in the plaintiffs “Third Supplemental and Amending Petition for Damages,” filed on August 13, 2007. Chevron USA Inc. filed exceptions and an answer to the plaintiffs’ third supplemental and amending petition on October 6, 2008, admitting |¡“Chevron U.S.A. Inc. is the successor in interest to Union Oil Company of California....” On July 12, 2010, Chevron USA Inc. filed a motion for summary judgment, asserting it was not the successor in interest to Union Oil Company of California.
From October 6, 2008 until July 12, 2010, Chevron USA Inc. participated in discovery with the rest of the remaining defendants. At times, Chevron USA Inc. was referred to collectively with other companies, including Union Oil Company of California, as “Chevron,” or as “Unocal.” This occurred even after Union Oil Company of California and Union Exploration Partners admitted responsibility for environmental damage under the Act and, thereby, included Chevron USA Inc. as “Unocal” in its references to admitting responsibility for environmental damage. Moreover, this confusion continued after Chevron USA Inc. filed its motion for summary judgment. In some filings, Chevron USA Inc. was referred to as “UNOCAL USA Inc.” either in the body of the document or on the signature line for defense counsel.
Plaintiffs opposed Chevron USA Inc.’s motion for summary judgment, arguing *1043 there were still issues of material fact they had not been able to discover. Plaintiffs claimed Chevron USA Inc. refused to produce a witness for a corporate deposition, sought to quash its notice for a corporate deposition and filed a motion for a protective order. After a hearing, the trial court deferred ruling on Chevron USA Inc.’s motion for protective order and motion to quash pending a corporate deposition limited to certain topics.
Thereafter, the defendants filed a motion and order for leave to file an amended answer to the plaintiffs’ petition. In this amended answer, the defendants denied Chevron USA Inc. was the successor in interest to Union Oil Company of California, while admitting Union Oil Company of California is the successor in interest to Union Exploration Partners, Ltd. On November 3, 2010, the trial court |figranted the motion for leave to file an amended answer. Plaintiffs applied for a writ to review that determination.
The corporate deposition of Chevron USA Inc. occurred on October 19, 2010. Chevron USA Inc. subsequently filed a supplemental memorandum to its motion for summary judgment, seeking dismissal, to include its amended answer. After a hearing, the trial court granted the motion for summary judgment, dismissing the claims against Chevron USA Inc. with prejudice and designating the ruling as a final judgment. Plaintiffs took a suspen-sive appeal from this ruling.
The court of appeal granted the School Board’s writ application regarding the trial court’s ruling allowing the defendants to amend their answer with the School Board’s suspensive appeal of the trial court’s grant of summary judgment in favor of Chevron USA Inc. The court of appeal then consolidated these issues relating to Chevron USA Inc. with the School Board’s appeal from the partial summary judgment in favor of all of the defendants.

Appellate Court Ruling

The court of appeal found the language of La. R.S. 30:29 to be clear and unambiguous, notwithstanding the judgment of the trial court and the defendants’ arguments. Relying on Section H of the statute, the appellate court held: “La. R.S. 30:29, by its clear language, provides for a landowner to recover damages in excess of those determined in the feasible plan whether they are based on tort or contract law.”[6] So finding, the court of appeal reversed the judgment of the trial court granting partial summary judgment in favor of the defendants. Because this determination overturned the lower court’s judgment, the court of appeal found it unnecessary to address the School Board’s argument that Act 312 is unconstitutional as applied by the trial court.
|7The court of appeal further found the trial court erred in granting summary judgment dismissing Chevron USA Inc. from the suit. The appellate court held:
It seems, at the very least, that there is a genuine issue of material fact as to whether Chevron U.S.A., Inc. is a successor in interest to Unocal. It took Chevron U.S.A. Inc. three years to determine that it had erred in its initial declaration that it was a successor in interest to Unocal. In making its determination, Chevron U.S.A., Inc. relied, at least in part, on the contents of service agreements that it maintained with Unocal. The School Board has not had access to these agreements and was allowed only a very limited deposition re *1044 garding the successor status of Chevron U.S.A., Inc.[7]
The court of appeal reversed the trial court’s judgment granting summary judgment in favor of Chevron USA Inc.
The defendants filed a writ seeking review of the court of appeal’s ruling in both regards. We granted the defendants’ writ to determine the correct interpretation of Act 312 and whether Chevron USA Inc. should be dismissed from suit.[8]
LAW AND DISCUSSION

Standards of Review

Both of the issues presented for our consideration come to us as summary judgments. As we recently stated in Smitko v. Gulf South Shrimp, Inc., 2011-2566, p. 7 (La.7/2/12); 94 So.3d 750, 755, “[a]ppellate review of the granting of a motion for summary judgment is de novo, using the identical criteria that govern the trial court’s consideration of whether summary judgment is appropriate.” A motion for summary judgment “shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law.” La. C.C.P. art. 966; Smitko, supra. This court has explained, a “genuine issue” is a “triable issue,” or “one as to Rwhich reasonable persons could disagree.” Hogg v. Chevron, 2009-2632, p. 6 (La.7/6/10); 45 So.3d 991, 997; Champagne v. Ward, 2003-3211, p. 5 (La.1/19/05); 893 So.2d 773, 777. A “material fact” is a fact, the existence or non-existence of which may be essential to a cause of action under the applicable theory of recovery. Hogg, supra; Champagne, supra.
The burden of proof remains with the moving party. La. C.C.P. art. 966(C)(2). However, a moving party who does not bear the burden of proof at trial is not required to negate all essential elements of the adverse party’s claim, but is required to point out an absence of factual support for one or more of its essential elements. Id. If the non-moving party fails to produce contrary factual support sufficient to establish it will be able to satisfy the evi-dentiary burden of proof at trial, there is no genuine issue of material fact. Id.
When summary judgment is granted in the context of statutory interpretation, there are no material issues of fact in dispute and the sole issue before us is a question of law as to the correct interpretation of the statute at issue. Vizzi v. Lafayette City-Parish Government, 2011-2648, p. 2 (La.7/2/12); 93 So.3d 1260, 1262. Legislation is the solemn expression of the will of the legislature. La. C.C. art. 2; First Nat. Bank, USA v. DDS Const., LLC, 2011-1418, p. 12 (La.1/24/12); 91 So.3d 944, 953. The determination of the legislature’s will must start with the language of the statute itself. McGlothlin v. Christus St. Patrick Hosp., 2010-2775, p. 11 (La.7/1/11); 65 So.3d 1218, 1227. The words used must be interpreted as they are generally understood. La. C.C. art. 11; McGlothlin, 2010-2775, p. 11; 65 So.3d at 1228. When the words of a statute are clear and unambiguous, and the application of the law does not lead to absurd consequences, the statute should be applied as written and no further effort should be made to determine the legislature’s intent. La. C.C. art. 9; La. R.S. 1:4; In re: Succession of Faget, 2010-0188, p. 8-9 (La.11/30/10); 53 So.3d 414, 420. Accordingly, we Rare bound to a strict interpreta *1045 tion of the plain language of the statutory provisions which are before us.
 When there is long-standing interpretation of a legal issue or several laws on a particular subject matter, we must also give due regard to the well-settled rules of statutory construction succinctly set forth in M.J. Farms, Ltd. v. Exxon Mobil Corp., 2007-2371, p. 13-14 (La.7/1/08); 998 So.2d 16, 27:
It is also well established that the Legislature is presumed to enact each statute with deliberation and with full knowledge of all existing laws on the same subject. [State v.] Johnson, [2003-2993 (La.10/19/04);] 884 So.2d [568] at 576; State v. Campbell, 03-3035 (La.7/6/04), 877 So.2d 112, 117. Thus, legislative language will be interpreted on the assumption the Legislature was aware of existing statutes, well established principles of statutory construction and with knowledge of the effect of their acts and a purpose in view. Johnson, 884 So.2d at 576-77; Campbell, 877 So.2d at 117. It is equally well settled under our rules of statutory construction, where it is possible, courts have a duty in the interpretation of a statute to adopt a construction which harmonizes and reconciles it with other provisions dealing with the same subject matter. La. Civ. Code art. 13; City of New Orleans v. Louisiana Assessors’ Retirement and Relief Fund, 05-2548, 986 So.2d 1 (La.10/1/07).
With these rules of statutory interpretation in mind, we now turn to a brief review of the law and jurisprudence relevant to the context into which the legislature enacted Act 312.

Relevant Law and Jurisprudence to Motion for Partial Summary Judgment

Plaintiffs’ petition seeking damages and remediation of property states causes of action in contract and tort, and violations of both the Civil Code and the Mineral Code. We will look at the source of each claim.
The plaintiffs’ contract claims are based on the mineral leases granted on the property. “Mineral leases are construed as leases generally, and the provisions of the Civil Code applicable to ordinary leases, when pertinent, are applied to mineral leases.” Caskey v. Kelly Oil Co., 1998-1193, p. 9 (La.6/29/99); 737 So.2d 1257, 1262; see also La. R.S. 31:2.[9] A mineral lease is a contract, which has the effect of | inlaw for the parties. La. C.C. art. 1983. As will be shown, La. R.S. 30:29 specifically states its provisions shall not be construed to impede or limit provisions under private contracts which impose their own remediation obligations. La. R.S. 30:29(A). In this case, the 1994 surface lease contains an express contract provision regarding remediation. As found by the trial court, that express contract provision did not form a part of the trial judge’s ruling and is not now before us.
The parties agree the 1935 oil, gas and mineral lease does not contain an express provision regarding the lessee’s remedia *1046 tion obligation. However, an implied obligation “to return the thing at the end of the lease in a condition that is the same as it was when the thing was delivered to him, except for normal wear and tear,” unless otherwise provided, is one of the principle obligations of a lessee. La. C.C. art. 2683(3). This implied obligation existed under Articles 2719 and 2720 of the Civil Code of 1870 at the time the 1935 lease was entered into.[10] After the 2004 revisions to the Civil Code, the implied obligation to repair or restore the thing leased has not been changed, but the Civil Code articles defining the implied obligation are now found in La. C.C. arts. 2683, supra, 2686, 2687, and 2692.[11] | n Plaintiffs allege the defendants have violated these Civil Code articles regarding the implied obligation of a lessee to remed-iate or restore damage to the thing leased.
Plaintiffs allege violations of the Mineral Code. As stated, before enactment of the Mineral Code, jurisprudence relying on the Civil Code articles recognized the lessee’s duty as encompassing, inter alia, the obligation to restore the surface as near as practical on completion of operations. Caskey, 1998-1193, p. 6; 737 So.2d at 1261.
The Louisiana Mineral Code, set forth in La. R.S. 31:1 el seq., was enacted in 1974 and went into effect on January 1, 1975. Broussard v. Hilcorp Energy Co., 2009-0449, p. 4 (La.10/20/09); 24 So.3d 813, 816. After the Mineral Code was enacted, some courts believed the restoration obligation of the lessee might be viewed as a part of' the general standard of a mineral lessee’s obligation to act as a reasonably prudent operator under La. R.S. 31:122.[12] La. R.S. 31:122 states: “A mineral lessee is not under a fiduciary obligation to his lessor, but he is bound to perform the contract in good faith and to develop and operate the property leased as a prudent operator for the mutual benefit of himself and his lessor. Parties may stipulate what shall constitute reasonably prudent conduct on the part of the lessee.”
In Terrebonne Parish School Bd. v. Castex Energy, Inc., 2004-0968, p. 10 (La.1/9/05); 893 So.2d 789, 797, this court noted the text of La. R.S. 31:122 does not impose a duty to restore the surface. Instead, the express terms of this article impose only two obligations upon a mineral lessee: (1) to perform the contract in good faith; and (2) to develop and operate the *1047 leased property as a reasonably 112prudent operator for the mutual benefit of the lessee and the lessor. Id. The court found the mineral code statute “simply adapts the general ‘good administrator’ standard of La. C.C. art. 2710, applicable to all leases, to the specific context of a mineral lease.” Id.[13] After reviewing the jurisprudence and the applicable provisions of the Civil Code, we held that, “in the absence of an express lease provision, Mineral Code article 122 does not impose an implied duty to restore the surface to its original, pre-lease condition absent proof that the lessee has exercised his rights under the lease unreasonably or excessively.” Id., 2004-0968, p. 17; 893 So.2d at 801. Consequently, unless there is evidence the lessee has exercised his rights under the lease unreasonably or excessively, “[a]n implied duty to restore/remediate the property is no longer encompassed in the prudent operator standard” of La. R.S. 31:122. Broussard, 2009-0449, p. 11 (La.10/20/09); 24 So.3d 813, 820.
Plaintiffs also assert several .tort claims in their petition, including negligence, strict liability, unjust enrichment, and trespass. Although asserting several tort theories of recovery, these claims all stem from the obligation imposed in La. C.C. art. 2315: “Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.”
This court has held “[o]ne injured through the fault of another is entitled to full indemnification for damages caused thereby.” Roman Catholic Church of Archdiocese of New Orleans v. Louisiana Gas Service Co., 618 So.2d 874, 876 (La.1993); Coleman v. Victor, 326 So.2d 344, 346 (La.1976). “When property is damaged through the legal fault of another, the primary objective is to restore the property as nearly as possible to the state it was in immediately preceding the | ^damage.... ” Coleman, 326 So.2d at 346. “Accordingly, the measure of damages is the cost of restoring the property to its former condition. In assessing damage to property, generally, courts have considered the cost of restoration as the proper measure of damage where the thing damaged can be adequately repaired.” Id., 326 So.2d at 346-347.
While stating the “primary objective” of recovery “is to restore the property as nearly as possible to the original state,” the court has acknowledged that, “at times, restoration is not possible and is sometimes not cost effective.” Hornsby v. Bayou Jack Logging, 2004-1297, p. 9 (La.5/6/05); 902 So.2d 361, 367. In Roman Catholic Church, supra, we held:
Accordingly, we conclude that, as a general rule of thumb, when a person sustains property damage due to the fault of another, he is entitled to recover damages including the cost of restoration that has been or may be reasonably incurred, or, at his election, the difference between the value of the property before and after the harm. If, however, the cost of restoring the property in its original condition is disproportionate to the value of the property or economically wasteful, unless there is a reason personal to the owner for restoring the original condition or there is a reason to believe that the plaintiff will, in fact, make the repairs, damages are measured only by the difference between the value of the property before and after the harm.[14]
*1048 Under the precepts of Roman Catholic Church, restoration damages for property based on tort which exceed the value of the property are justifiable only when there are “reasons personal to the owner” or there is reason to believe the landowner will, in fact, use the damages to restore the property. See Hornsby, 2004-1297, p. 11; 902 So.2d at 368.

Corbello v. Iowa Production

In 2003, this court decided Corbello v. Iowa Production, 2002-0826 (La.2/25/03); 850 So.2d 686. Landowners filed suit against a mineral lessee to recover damages in trespass after expiration of a surface lease, for unauthorized disposal of saltwater on the property, and for the poor condition of the leased premises. In | ^addition to other damage awards, the jury awarded the landowners $33 million to restore the leased premises to its condition at the time the lease was entered into. The mineral lease at issue in Corbello contained an express provision the lessee would “reasonably restore the premises as nearly as possible to their present condition.” Id., 2002-0826, p. 6-7; 850 So.2d at 694.
This court held damages to immovable property should not be governed by the rule enunciated in Roman Catholic Church. In other words, the amount of damages would not be tied to the value of the land. In Corbello, we said:
while we find it logical in tort cases to tether the amount of damages by balancing the amount to be paid by the negligent tortfeasor against the goal to restore the plaintiff, as closely as possible, to the position which he would have occupied had the accident never occurred, this same logic should not be extended to breach of contract cases. Id., 2002-0826, p. 8; 850 So.2d at 695.
After reviewing the damages awarded for restoration under the manifest error standard, we affirmed the $33 million award. Id., 2002-0826, p. 12; 850 So.2d at 697.
A large part of the damages plaintiffs recovered were for restoration of groundwater damage which threatened the Chicot Aquifer, the source of drinking water for Lake Charles, Louisiana. In this court, the mineral lessee argued the appellate court’s affirmance of this award to plaintiffs for what is strictly an alleged public injury was error, where the plaintiffs had no legal duty to use the award to restore the property. We found the contamination of the groundwater was both a public injury and a private injury, which would not prevent plaintiffs from collecting damages. Id., 2002-0826, p. 16; 850 So.2d at 699.
We noted the legislature had not implemented “a procedure to ensure that landowners will in fact use the money to clean the property.” Id. We recognized the two opposing public policy concerns which the then-existing state of the law created. At that time, a landowner suing for remediation of contaminated land |15could sue and receive remediation damages, yet was under no obligation to use the damage award to restore the property. At the same time, there was a strong possibility that land would remain polluted if landowners could not bring suit for remediation. Id., 2002-0826, p. 20, 850 So.2d at 701.[15]
*1049 Corbello was decided in February of 2003. The legislature responded in the 2003 legislative session by enacting La. R.S. 30:2015.1, effective July 2, 2003, which set forth procedures for the remediation of usable groundwater in the public’s interest. In 2006, the legislature extended its remediation procedures into other environmental media by enacting Act 312, which established a procedure to ensure the remediation of oilfield sites and exploration and production sites in La. R.S. 30:29. We now turn to the provisions of the statute at issue and its interpretation.

Interpretation of La. R.S. 30:29

In Corbello, we observed plaintiffs who were awarded remediation damages were under no statutory obligation to perform remediation work. The purpose of Act 312 was to create such an obligation. In Act 312, the legislature provided a mechanism whereby the landowner does not receive that portion of the remediation 11fiaward needed to fund the statutorily mandated plan to remediate the property to a point that protects the public’s interest. As the following analysis will show, Act 312 ensures the damages awarded for remediation will be used only for remediation to the extent necessary to fund the statutorily required plan, into which the La. DNR has input, and which is ultimately approved by the court.
We agree with the court of appeal the language of Act 312 is clear and unambiguous. We will presently describe each section of the Act, but its overall effect is this: The procedure described under the Act does not interfere with private rights, whether they arise contractually or by law. The procedure under the Act does not prohibit the award of remediation damages for more than the amount necessary to fund the statutorily mandated feasible plan, nor does the procedure described in the Act intrude into the manner in which remediation damages are determined. The Act makes no changes to the normal trial procedures established by the Code of Civil Procedure. The only change accomplished by Act 312 is how the damages to remediate property are spent. Under Act 312, landowners do not receive that portion of the remediation damages award needed to fund the statutorily mandated feasible plan; these funds must be deposited into the registry of the court. Finally, although the La. DNR has input into the plan to remediate the property, the final decision as to the remediation plan adopted rests with the court. Throughout the remediation process, the court remains the gatekeeper to ensure the purpose of the Act is accomplished — remediation of the property to the extent of the public’s interest.
In Subsection (A), the legislature clearly states its intention in enacting this legislation.[16] Under its constitutional power to legislate on behalf of the public’s 117interest *1050 in environmental matters, the legislature develops a procedure within the Act to ensure that damage to the environment is remediated “to a standard that protects the public interest” in oilfield sites and exploration and production sites. The procedure adopted does not impede or limit the rights of parties to a contract.[17]
The temporal order of procedural events in cases to which Act 312 applies is plainly set out in the statute. First, suit making a judicial demand covered by the Act is filed. La. R.S. 30:29(B)(1).[18] Then, notice is provided by the plaintiffs to the La. DNR, Commissioner of Conservation (also referred to in the statute as “the department”) and the attorney general. Id. No judgment or order granting relief can be rendered in the suit, unless the state receives this notice. La. R.S. 30:29(B)(4).[19] The department and the attorney general intervene in the suit if they choose to do so. La. R.S. 80:29(B)(2).[20] However, the department and the attorney general retain the authority to independently bring a civil or administrative | ^enforcement action. La. R.S. 30:29(B)(2) and (3).[21]
*1051 The matter proceeds to trial in the same manner as any other proceeding; no provision of the Act changes normal trial procedures. This means pre-trial discovery is conducted and the case proceeds in accordance with the Code of Civil Procedure. Unless a defendant admits responsibility or liability for “environmental damage” as defined by the Act, La. R.S. 30:29(1),[22] all claims, including contractual or private claims, are determined by the finder of fact at trial.
Subsection C of the statute sets forth the additional, mandated procedures to be used for the determination of a remediation plan post-trial, as well as the appellate review of those determinations. At trial (in the absence of an admission), the finder of fact must initially determine whether environmental damage exists | inand whether the defendant or defendants are legally responsible therefore.[23] As will be discussed, the finder of fact will have other determinations to make, but for now, we will discuss only those matters to which the legislative procedure under La. R.S. 30:29 applies. La. R.S. 30:29(C)(1).[24] If at trial the finder of fact determines environ *1052 mental damage exists and determines the party or parties who caused the damage or who are otherwise legally responsible for the damage, the court orders the party or parties responsible to develop a remediation plan to be submitted to the court and the department. Deadlines are provided for such submissions in the statute. Id. The plaintiff and any other party are allowed to submit remediation plans to the department. Id.
Thereafter, the department holds a public hearing on the submissions. La. R.S. 30:29(C)(2).[25] Within a time set by the statute, the department determines, | abased on evidence submitted, the most feasible plan to accomplish the evaluation/remediation of the environmental damage while protecting the health, safety and welfare of the public. M[26] By mandating that “applicable standards” shall be used and applied in approving or structuring the most feasible plan to evaluate or remediate the environmental damage, the legislature has not limited the department to any one standard in its development of the most feasible plan. La. R.S. 30:29(C)(3).[27] The plan approved by the department is not to be considered an adjudication subject to appellate review. La. R.S. 30:29(C)(4).[28]
Instead, the plan approved by the department is sent to the court for its review. The plaintiff or any other party may submit its own plan, comment or input in response, within a certain time frame. La. R.S. 30:29(C)(1). Unless a party proves by a preponderance of evidence that another plan is a more feasible plan, the court shall adopt the plan approved by the department. If the court enters a judgment adopting a plan other than the one approved by the department, the court shall assign written reasons. Once a plan is determined, the court shall order the party or parties admitting responsibility or found legally responsible by the court to fund the implementation of the plan. In making this determination, the court will decide how much of the damages are to be used *1053 for remediation of the property. La. R.S. 30:29(C)(5).[29]
121 The court’s judgment adopting a plan of evaluation or remediation and ordering the legally responsible parties to deposit funds into the court’s registry shall be considered a final judgment for appeal purposes. La. R.S. 30:29(C)(6)(a).[30] The legislature provides the standard of review for such an appeal and the manner in which such an appeal shall be heard and decided. La. R.S. 30:29(C)(6)(b) and (c).[31]
Subsection D of the statute provides how the most feasible plan is implemented. Subsection (1) states:
D. (1) Whether or not the department or the attorney general intervenes, and except as provided in Subsection H of this Section, all damages or payments in any civil action, including interest thereon, awarded for the evaluation or remediation of environmental damage shall be paid exclusively into the registry of the court in an interest-bearing account with the interest accruing to the account for clean up.
The defendants point to this subsection as authority for their argument that Act 312 caps remediation damages as the amount determined necessary to fund feasible plan. However, the defendants read Section D in isolation, without considering the other provisions of the statute, particularly Subsection H referenced therein, or the limited nature of the focus of the procedure enacted by the legislature. The legislature has not, in this solely procedural statute, stripped landowners of any of their substantive rights. The statute repeatedly assures this.
Subsection D(1) must be read with Subsection (H), which provides:
H. This Section shall not preclude an owner of land from pursuing a judicial remedy or receiving a judicial award for private claims suffered as a result of environmental damage, except as otherwise provided in this Section. Nor shall it preclude a judgment ordering damages for or implementation of additional remediation in excess of bathe requirements of the plan adopted by the court pursuant to this Section as may be required in accordance with the terms of an express contractual provision. Any award granted in connection with the judgment for additional remediation is not required to be paid into the registry of the court. This Section shall not be interpreted to create any cause of action or to impose additional implied obligations under the mineral code or arising out of a mineral lease.
*1054 In Subsection H, the legislature specifically makes clear the statute was not intended to change the substantive law. Subsection H states that the procedure enacted by this Section shall not preclude a landowner from pursuing a judicial remedy or receiving a judicial award for private claims, other than those remediation damages necessary to fund the feasible plan to remediate the land to a standard that protects the public interest, ie. “except as otherwise provided in this Section.” If a court awards remediation damages pursuant to an express contract provision that is a greater amount than that ordered to be placed into the court’s registry to fund the remediation plan, then the landowner is entitled to those “excess” remediation damages. Likewise, “any award” for “additional remediation” may be kept by the landowner, as well. If the money judgment for remediation exceeds the amount necessary to fund the plan, the plaintiff is granted a personal judgment for the “excess” remediation damages; plaintiff is also granted a personal judgment on his other non-remediation private claims (if he prevailed on such claims at trial). All of these determinations are made part of a single judgment, and any party aggrieved by any aspect of this single judgment may appeal. The court of appeal correctly determined “[t]he clear language of the statute contemplates the landowner receiving an award in addition to that provided by the feasible plan.”[32] The legislature states that the procedure it enacts in this legislation should not be interpreted as creating any cause of action or to impose additional implied obligations under the Mineral Code or arising out of a mineral lease that is not already there. As previously discussed, this procedural statute ^does nothing to the substantive rights of the landowner, whether arising out of (1) the implied obligations of the mineral lease under the Civil Code or (2) the implied obligation arising out of La. R.S. 31:122 if the landowner can show a mineral lessee has acted unreasonably or excessively under the lease.
Reading the two subsections together, it is clear that when Subsection D(1) provides: “except as provided in Subsection H ... all damages ... awarded for the evaluation or remediation of environmental damage shall be paid exclusively into the registry of the court ...,” that means the amount of remediation damages necessary to fund the feasible plan adopted by the court, ie. all damages awarded for the evaluation or remediation of environmental damage to a standard that protects the public interest. The defendants’ arguments that rely on Subsection D(1) have no merit as they simply fail to take into account the entirety of the provisions of the subsection.
The rest of Subsection D and Subsection F concern housekeeping matters with regard to the deposit of the funds into the registry of the court to fund the feasible plan and their expenditure. In addition, the continuing oversight of the court and the department is provided. If the court determines the amount of the funds deposited is insufficient to complete the approved evaluation and remediation of the property, the court may, on the motion of any party or on its own motion, order the parties found legally responsible to deposit additional funds into the court’s registry. Once the evaluation or remediation is complete, any remaining funds are to be returned to the depositor.[33] The party or parties | ¡.¿admitting responsibility or found *1055 legally responsible must file periodic progress reports as required by the court or the department, and the court and the department retain oversight to ensure compliance with the remediation plan adopted.[34]
The legislature further provided in Subsection E the party or parties admitting responsibility or found legally responsible for environmental damage would pay the costs of the department, the attorney general and the parties providing evidence upon which the judgment is based, as well as attorneys fees.[35] Subsection J provides for a procedure which must be used when a case seeking remediation of property is settled.[36] Finally, in Subsection K, the *1056 legislature set | asfortli which cases to which the statute would be applicable.[37]
In their brief, the defendants claim the court of appeal’s holding is inconsistent with our decisions in M.J. Farms, supra and Marin v. Exxon Mobil Corp., 2009-2368 (La.10/19/10); 48 So.3d 234. Nothing in our interpretation of Act 312 in the present case conflicts with these two previous holdings of the court.
At issue in M.J. Farms was the applicability of Act 312 and whether it could be applied to a case filed before its effective date. We held the provisions of Act 312 “are called into play” whenever a private suit is filed which involves environmental damage subject to the jurisdiction of the La. DNR. Id., 2007-2371, p. 15; 998 So.2d at 28. We also held Act 312 applied “retrospectively and prospectively except for the limited number of cases for which an order had been issued or signed setting the case for trial as of March 27, 2006.” Id., 2007-2371, p. 20; 998 So.2d at 30.
This court also answered some constitutional questions raised by application of the statute to the claims asserted by the plaintiff in M.J. Farms. Referencing Subsection H of the statute, we held Act 312 was not a substantive amendment of the law and the plaintiff was not divested of any of his causes of action. Id., 2007-2371, p. 26-27; 998 So.2d at 34-35. We found the provisions of Act 312 represented a reasonable restriction on a party’s private rights under La. Const, art. 1, Section 4,[38] and found the procedure adopted by Act 312 “simply s[ought] to ensure that the property that is environmentally damaged is actually remediated.” 2007-2371, p. 30; 998 So.2d at 36. We noted the provisions of Subsection A which declared: “[i]t is the duty of the legislature to set forth procedures to ensure that damage to the environment is remediated to a standard that protects the public interest.” Id., 2007-2371, p. 27; 998 So.2d at 35. In that vein, we found the application of Act 312 to the plaintiffs causes of action “implements and facilitates the accomplishment of [plaintiffs] prayer for the remediation and restoration of its property from the party or parties found liable for such damages.” Id., 2007-2371, p. 28; 998 So.2d at 35.
In our review of Act 312 and the procedure it enacted, we noted six basic components to the legislation. We then provided a general outline of the statute.[39] Since we were not asked in M.J. Farms to interpret the specific workings of the statute, as we are here, our analysis went no further. However, we find nothing in M.J. Farms inconsistent with our more detailed analysis here.
Finally, in M.J. Farms, we noted Act 312 “changes the remedy available to [the plaintiff] in its efforts to obtain surface *1057 restoration of its immovable property....” Id., 2007-2371, p. 31; 998 So.2d at 37. We held this change did not deny the plaintiff access to the courts. Id. The change in remedy to which we were referring was the fact that, through the procedure described in the Act, the plaintiff would not receive a portion of the remediation damages which may be awarded to him.[40]
The defendants rely on Marin as authority for their argument that the plaintiffs are not entitled to more than a regulatory clean-up, even if they acted unreasonably or excessively under the lease. In effect, the defendants argue Act 312 not only functions as a cap on remediation damages, but the procedure it enacts did away with a landowner’s rights under Castex. The defendants fail to 127carefully read our holdings in Marin, and instead, cite to a portion of the opinion where the arguments of the defendants were presented.[41]
In Marin, plaintiffs filed suit seeking damages and remediation of property under both contract and tort. After a five-day bench trial, the trial court found the mineral lessee defendants acted unreasonably and negligently in their operations. In addition to other awards, plaintiffs were awarded compensatory damages in the amount the court found it would take to remediate the soil to state regulatory standards. Id., 2009-2368, p. 7-8; 48 So.3d at 242-243. In determining the plaintiffs’ rights under the contract claims, we reviewed the relevant articles under the Civil Code and Mineral Code. Id., 2009-2368, p. 29-32; 48 So.3d at 255-256. We concluded:
In our view, the duty to remediate oilfield containment exists under the prudent operator standard of the Mineral Code by virtue of our holding in Cas-tex, and it certainly exists under the Civil Code. The holding in Castex merely recognized that in absence of unreasonableness or excessiveness, the lessee has the duty to restore the surface minus normal wear and tear. Where the lessee has operated unreasonably or excessively, as in this case, the lessee has additional obligations, e.g., the obligation to correct the damage due to the unreasonable or excessive operations. However, that does not necessarily mean that the lessee has a duty to restore the land to its pre-lease condition, particularly where, unlike dredged canals [at issue in Castex ], subsurface contamination is not overt and cannot be considered “wear and tear.” Castex explained that in determining what constitutes necessary “wear and tear” in a particular case, “it is useful to consider the character of the specific rights granted in the lease” to consider whether the lessor consented to the particular activities. 893 So.2d at 800. The damage caused by [the defendant’s] unreasonable operations was the contamination of the soil, and it is clear plaintiffs did not consent to this contamination. Therefore, [the defendant’s] additional restoration duty is the duty to correct the contamination. The lower courts both correctly recognized this point and held that remediation to 29B standards satisfied the Castex requirements. Id., 2009-2368, p. 37-38; 48 So.3d at 259-260.
Far from abandoning the requirements of Castex, Marin reaffirmed them. After finding the defendants acted unreasonably and excessively under their miner *1058 al lease, the trial court found the regulatory standards of 29B would | ^remediate the property to a standard that protected the public interest in that case. There has been no abandonment of necessity to determine “[t]hat which constitutes an ‘unreasonable exercise of contractual rights’ ... on a case by case basis.” Broussard v. Northcott Exploration Co., Inc., 481 So.2d 125, 129 (La.1986). In addition, as stated in Castex, and reaffirmed in Marin, the character of the specific rights granted in a lease is useful in determining what constitutes necessary “wear and tear” in a particular case. Castex, 2004-0968, p. 16; 893 So.2d at 800; Marin, supra.
In Marin, we reviewed the degree of remediation in a case already tried. In this case, the plaintiffs’ contract and tort claims have not been determined by a finder of fact. In addition to the questions necessary to determine the applicability of Act 312, i.e. whether environmental damage exists and whether the defendants are the party or parties legally responsible for the damage, the finder of fact in this case will have to make several determinations in resolving the plaintiffs’ contract and tort claims. Only after all of the plaintiffs’ claims have been heard, and a finding is made the plaintiffs are entitled to remediation of the property, will the procedure mandated in La. R.S. 30:29 come into play, as described supra.
After our de novo review, we find the court of appeal correctly reversed the ruling of the trial court on the motion for partial summary judgment. On the legal question of the correct interpretation of La. R.S. 30:29, we affirm the court of appeal’s decision for the reasons expressed herein.

Motion for Summary Judgment

Defendants moved for summary judgment, seeking the dismissal of Chevron USA Inc. from the suit. Attached to its motion was an affidavit of Frank Soler, the senior liaison in the subsidiary governance unit of the corporate governance department for Chevron Corp., the parent organization to both Chevron USA Inc. and Union Oil Company of California. Mr. Soler’s affidavit was supplemented bypshis deposition when he was deposed as the corporate representative of Chevron USA Inc. in a limited fashion ordered by the court.
In his deposition, Mr. Soler detailed the corporate histories of both Chevron USA Inc. and Union Oil Company of California, or Unocal, and stated the two companies are separate and do not overlap. Mr. Soler testified these two companies do not have an ownership interest in each other, nor do they influence or control each other. According to Mr. Soler, the liabilities and assets of Union Oil Company of California were not transferred out of that company when it was acquired by Chevron Corp. Mr. Soler indicated the assets of Union Oil Company of California were $18 billion, and that any judgment against it would be paid from its funds alone.
However, Mr. Soler also indicated Union Oil Company of California does not have any employees at this time and Chevron USA Inc. was one of various entities that may have entered into general service agreements with the Unocal entities. Mr. Soler testified there are, or may be, service agreements in place between the companies, including day to day business operations and transactions which could include environmental issues.
Although Chevron USA Inc. is the party moving for summary judgment, it will not bear the burden of proof at trial. Thus, Chevron USA Inc. is not required to negate all essential elements of plaintiffs’ claim against it, but is only required to point out an absence of factual support for one or more of its essential elements. The plaintiffs have argued they have not been *1059 able to rebut Chevron USA Inc.’s assertions that it is not the successor in interest to Union Oil Company of California because it has been prevented from discovering additional information.
We agree with the court of appeal’s conclusion that there seems to be, at the very least, a genuine issue of material fact as to Chevron USA Inc.’s successor status to Union Oil Company of California. Chevron USA Inc.’s initial answer and | snsubsequent conduct in discovery, some of which could be dismissed as mere inattention to detail, was still more than mere inadvertence. Plaintiffs were allowed only a very limited corporate deposition of Chevron USA Inc. and have not had access to the service agreements referenced in Mr. Soler’s deposition. On this basis, we must agree with the court of appeal that, at this time, Chevron USA Inc. is not entitled to summary judgment. Consequently, we affirm the court of appeal’s opinion in this regard.
DECREE
For the foregoing reasons, the judgment of the court of appeal reversing the trial court’s granting of the motion for partial summary judgment on the issue of remediation damages is affirmed. The judgment of the court of appeal reversing the trial court’s granting of the motion for summary judgment dismissing from suit Chevron USA Inc. is also affirmed. The case is remanded to the trial court for further proceedings consistent with this opinion. All costs of these proceedings are taxed equally among the defendants.
AFFIRMED AND REMANDED.
Retired Judge ROBERT J. KLEES, assigned as Justice ad hoc, sitting for KNOLL, J., recused.
VICTORY, Justice, dissents in part.
GUIDRY, Justice, concurs in the result and assigns reasons.

. Retired Judge Robert J. Klees, assigned as Justice ad hoc, sitting for Knoll, J., recused.

.The following defendants have been dismissed without prejudice from the suit: Louisiana Land and Exploration Company; Peak Operating Company; Phoenix Oil & Gas Corporation; Inexco Oil Company; SWEPI LP; Louisiana Onshore Properties LLC; and El Paso E & P Company, L.P.

. La. R.S. 30:29 will also be referred to as "Act 312” in this opinion.

. See State of Louisiana and the Vermilion Parish School Board v. Louisiana Land and Exploration Company, et al., 10-00666 (La. 3rd Cir., 6/29/10) (unpublished), Vol. 7, p. *1042 1554-1555. Although the original motion was filed by Unocal, the defendants collectively sought review.

. See State of Louisiana and the Vermilion Parish School Board v. Louisiana Land and Exploration Company, et al., 2010-1796 (La.9/17/10), 45 So.3d 1058; Vol. 22, p. 5454.

. State of Louisiana v. Louisiana Land and Exploration Co., 2010-1341, p. 6 (La.App. 3 Cir. 2/1/12); 85 So.3d 158, 162.

. Id., 2010-1341, p. 8; 85 So.3d at 163.

. State of Louisiana v. Louisiana Land and Exploration Co., 2012-0884 (La.6/15/12); 92 So.3d 340.

. La. R.S. 31:2 discusses the relationship between the Mineral Code and the Civil Code: "The provisions of this Code are supplementary to those of the Louisiana Civil Code and are applicable specifically to the subject matter of mineral law. In the event of conflict between the provisions of this Code and those of the Civil Code or other laws the provisions of this Code shall prevail. If this Code does not expressly or impliedly provide for a particular situation, the Civil Code or other laws are applicable.” The Comment to this statute states: "The Mineral Code is a specialized extension of the Civil Code, and in instances where the Mineral Code does not make express or implied provision for a particular situation, it is intended that the principles of the Civil Code will continue to be applicable, either directly or by appropriate analogy.”

. Former La. C.C. art. 2719 (1870) provided: "If an inventory has been made of the premises in which the situation, at the time of the lease, has been stated, it shall be the duty of the lessee to deliver back everything in the same state in which it was when taken possession of by him, making, however, the necessary allowance for wear and tear and for unavoidable accidents.” Former La. C.C. art. 2720 (1870) stated: "If no inventory has been made, the lessee is presumed to have received the thing in good order, and he must return it in the same state, with the exceptions contained in the preceding article.” The concepts behind these 1870 Civil Code articles are of even earlier origin and are found in the Civil Code of 1808 at arts. 33, 34 and in the Civil Code of 1825 at arts. 2689 and 2690. See 2008 Compiled Edition of the Civil Codes of Louisiana, "Articles 1467 to 2777,” p. 877-878.

. La. C.C. art. 2686 states: "If the lessee uses the thing for a purpose other than that for which it was leased or in a manner that may cause damage to the thing, the lessor may obtain injunctive relief, dissolution of the lease, and any damages he may have sustained.” La. C.C. art. 2687 states: The lessee is liable for damage to the thing caused by his fault or that of a person who, with his consent, is on the premises or uses the thing.” La. C.C. art. 2692 states: "The lessee is bound to repair damage to the thing caused by his fault or that of persons who, with his consent, are on the premises or use the things, and to repair any deterioration resulting from his or their use to the extent it exceeds the normal or agreed use of the thing.”

. See La. R.S. 31:122; Comment.

. The quotation refers to former La. C.C. art. 2710 (1870), which provided: "The lessee is bound: (1) to enjoy the thing leased as a good administrator; according to the use to which it was intended by the lease. (2) To pay the rent at the terms agreed on.” 2008 Compiled Edition of the Civil Codes of Louisiana, "Articles 1467 to 2777,” p. 868.

. Id., 618 So.2d at 879-880.

. This is not the first time this perplexing state of the law was noticed. An earlier expression is found in Justice Lemmon’s concurrence in Magnolia Coal Terminal v. Phillips Oil Co., 576 So.2d 475, 486 (La.1991) (Lemmon, J. concurring). In Magnolia Coal, a trial court awarded total damages of $4.5 million for oilfield contamination of land. Justice Lemmon wrote:
The most difficult problem with affirming the part of the trial court's judgment which awards damages for failure to clean up the oil contamination is that the landowner receives a money judgment with no restriction on the use of the money. Plaintiff is apparently free to use this money for purposes other than restoring the land, and the public is left unprotected. Moreover, the *1049 Commissioner [of Conservation] has ordered defendant to clean up the site, and the defendant is possibly exposed to paying twice for the restoration. Id.
While agreeing the plaintiff proved its entitlement to an award of damages, Justice Lem-mon proposed the following as a remedy:
I would prefer to this court to formulate an abnormal solution for this abnormal situation, rather than a straight award of money damages as the remedy. Perhaps defendant should be ordered to establish a trust fund in a fixed amount to pay for the restoration of the land to be performed by a responsible third party under a bonded contract. Or perhaps some other equitable relief is more appropriate. In any event, the present relief may be insufficient to protect the parties, the public and the environment, and I would prefer to fashion more appropriate relief under the overall circumstances. Id.

. La. R.S. 30:29(A) states:
§ 29. Remediation of oilfield sites and exploration and production sites
A. The legislature hereby finds and declares that Article IX, Section 1 of the Constitution of Louisiana mandates that the natural resources and the environment of the state, including ground water, are to be protected, *1050 conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people and further mandates that the legislature enact laws to implement this policy. It is the duty of the legislature to set forth procedures to ensure that damage to the environment is remediated to a standard that protects the public interest. To this end, this Section provides the procedure for judicial resolution of claims for environmental damage to property arising from activities subject to the jurisdiction of the Department of Natural Resources, office of conservation. The provisions of this Section shall be implemented upon receipt of timely notice as required by Paragraph (B)(1) of this Section. The provisions of this Section shall not be construed to impede or limit provisions under private contracts imposing remediation obligations in excess of the requirements of the department or limit the right of a party to a private contract to enforce any contract provision in a court of proper jurisdiction.

. See also La. R.S. 30:29(G), which states in pertinent part: “The provisions of this Section are intended to ensure evaluation or remediation of environmental damage.”

. La. R.S. 30:29(B)(1) states: "Notwithstanding any law to the contrary, immediately upon the filing or amendment of any litigation or pleading making a judicial demand arising from or alleging environmental damage, the provisions of this Section shall apply and the party filing same shall provide timely notice to the state of Louisiana through the Department of Natural Resources, commissioner of conservation and the attorney general. The litigation shall be stayed with respect to any such judicial demand until thirty days after such notice is issued and return receipt is filed with the court.”

. La. R.S. 30:29(B)(4) provides: "No judgment or order shall be rendered granting any relief in such litigation to which this Section applies, nor shall the litigation be dismissed, until timely notice is received by the state of Louisiana as set forth in this Subsection.”

. La. R.S. 30:29(B)(2) states: "The department or the attorney general, in accordance with their areas of constitutional and statutory authority and regulations adopted pursuant thereto, shall have the right to intervene in such litigation in accordance with the Louisiana Code of Civil Procedure. Nothing in this Section shall diminish the authority of the department or the attorney general to independently bring any civil or administrative enforcement action. Nor shall anything in this Section preclude the department from independently responding in a timely manner to an inquiry or request by a landowner for investigation.”

. La. R.S. 30:29(B)(3) states: "Any judgment or order in any litigation to which this Section applies shall be without prejudice to any independent civij or administrative action by the department or the attorney general regarding any environmental damage alleged therein. No such judgment or order in such litigation may bar the department or the attorney general pursuant to R.S. 13:4231 et seq., or otherwise from pursuing any independent civil or administrative action regarding environmental damage alleged therein, regardless of whether the department or the attorney general has intervened.”

.La. R.S. 30:29(1) contains definitions for terms used in the Act, as follows:
I. For the purposes of this Section, the following terms shall have the following meanings:
(1) “Environmental damage” shall mean any actual or potential impact, damage, or injury to environmental media caused by contamination resulting from activities associated with oilfield sites or exploration and production sites. Environmental media shall include but not be limited to soil, surface water, ground water, or sediment.
(2) "Evaluation or remediation” shall include but not be limited to investigation, testing, monitoring, containment, prevention, or abatement.
(3) “Feasible Plan” means the most reasonable plan which addresses environmental damage in conformity with the requirements of Louisiana Constitution Article IX, Section 1 to protect the environment, public health, safety and welfare, and is in compliance with the specific relevant and applicable standards and regulations promulgated by a state agency in accordance with the Administrative Procedure Act in effect at the time of clean up to remediate contamination resulting from oilfield or exploration and production operations or waste.
(4) "Oilfield site” or "exploration and production (E & P) site” means any location or any portion thereof on which oil or gas exploration, development, or production activities have occurred, including wells, equipment, tanks, flow lines or impoundments used for the purposes of the drilling, workover, production, primary separation, disposal, transportation or storage of E & P wastes, crude oil and natural gas processing, transportation or storage of a common production stream of crude oil, natural gas, coal seam natural gas, or geothermal energy prior to a custody transfer or a sales point. In general, this definition would apply to all exploration and production operations located on the same lease, unit or field.
(5)“Timely notice” means written notice sent by certified mail, return receipt requested. Such notice shall include a copy of the petition and any other filing in such litigation.

. La. R.S. 30:29(G) states, in pertinent part: "... If the court finds that no environmental damage exists, the court may dismiss the department or attorney general from the litigation without prejudice.”

. La. R.S. 30:29(C)(1) states:
C. (1) If at any time during the proceeding a party admits liability for environmental damage or the finder of fact determines that environmental damage exists and determines the party or parties who caused the damage or who are otherwise legally responsible therefor, the court shall order the party or parties who admit responsibility or whom the court finds legally responsible for the damage to develop a plan or submittal for the evaluation or remediation to applicable regulatory standards of the contamination that resulted in the environmental damage. The court shall order that the plan be developed and submitted to the department and the court within a time that the court determines is reasonable and shall allow the plaintiff or any other party at least thirty days from the date each plan or submittal was made to the department and the court to review the plan or submit-tal and provide to the department and the court a plan, comment, or input in response *1052 thereto. The department shall consider any plan, comment, or response provided timely by any party. The department shall submit to the court a schedule of estimated costs for review of the plans or submittals of the parties by the department and the court shall require the party admitting responsibility or the party found legally responsible by the court to deposit in the registry of the court sufficient funds to pay the cost of the department's review of the plans or submit-tals. Any plan or submittal shall include an estimation of cost to implement the plan.

.La. R.S. 30:29(C)(2) states:
Within sixty days from the last day on which any party may provide the department with a plan, comment, or response to a plan as provided in Paragraph (0(1) of this Section, the department shall conduct a public hearing on the plan or plans submitted. Within sixty days of the conclusion of the hearing, the department shall approve or structure a plan based on the evidence submitted which the department determines to be the most feasible plan to evaluate or remediate the environmental damage and protect the health, safety, and welfare of the people. The department shall issue written reasons for the plan it approves or structures. On motion of the department, for good cause shown, the court may grant the department additional time, not to exceed sixty days, within which to either conduct the hearing or approve a plan with reasons.

. “Feasible plan” is defined at La. R.S. 30:29(I)(3), supra.

. La. R.S. 30:29(C)(3) provides: "The department shall use and apply the applicable standards in approving or structuring a plan that the department determines to be the most feasible plan to evaluate or remediate the environmental damage.”

. La. R.S. 30:29(C)(4) states: "The plan approved by the department for submission to the court shall not be considered to be an adjudication subject to appellate review pursuant to R.S. 49:964 or R.S. 30:12.”

. La. R.S. 30:29(C)(5) states: "The court shall adopt the plan approved by the department, unless a party proves by a preponderance of the evidence that another plan is a more feasible plan to adequately protect the environment and the public health, safety, and welfare. The court shall enter a judgment adopting a plan with written reasons assigned. Upon adoption of a plan, the court shall order the party or parties admitting responsibility or the party or parties found legally responsible by the court to fund the implementation of the plan.”

. La. R.S. 30:29(C)(6)(a) states: "Any judgment adopting a plan of evaluation or remediation pursuant to this Section and ordering the party or parties admitting responsibility or the party or parties found legally responsible by the court to deposit funds for the implementation thereof into the registry of the court pursuant to this Section shall be considered a final judgment pursuant to the Code of Civil Procedure Article 2081 et seq., for purposes of appeal.”

. La. R.S. 30:29(C)(6)(b) states: "Any appeal under this Section shall be a de novo review and shall be heard with preference and on an expedited basis.” La. R.S. 30:29(C)(6)(c) states: "The appellate court may affirm the trial court’s adoption of a plan or may adopt a feasible plan in conformity with this Section and shall issue written reasons for its decision."

. State of Louisiana v. Louisiana Land and Exploration Co., 2010-1341 p. 6; 85 So.3d at 162.

. La. R.S. 30:29(D)(2)-(4) state:
(2) The court may allow any funds to be paid into the registry of the court to be paid in increments as necessary to fund the evaluation or remediation and implementation of *1055 any plan or submittal adopted by the court. In any instance in which the court allows the funds to be paid in increments, whether or not an appeal is taken, the court shall require the posting of a bond for the implementation of the plan in such amount as provided by and in accordance with the procedures set forth for the posting of suspensive appeal bonds. Any such bond shall be valid through completion of the remediation.
(3) The court shall issue such orders as may be necessary to ensure that any such funds are actually expended in a manner consistent with the adopted plan for the evaluation or remediation of the environmental damage for which the award or payment is made.
(4) The court shall retain jurisdiction over the funds deposited and the party or parties admitting responsibility or the party or parties found legally responsible by the court until such time as the evaluation or remediation is completed. If the court finds the amount of the initial deposit insufficient to complete the evaluation or remediation, the court shall, on the motion of any party or on its own motion, order the party or parties admitting responsibility or found legally responsible by the court to deposit additional funds into the registry of the court. Upon completion of the evaluation or remediation, the court shall order any funds remaining in the registry of the court to be returned to the depositor. The department and the parties shall notify the court of the completion of any evaluation or remediation.

. La. R.S. 30:29(F) states: "The court and the department shall retain oversight to ensure compliance with the plan. The party or parties admitting responsibility or the party or parties found legally responsible by the court shall file progress reports periodically as the court or the department may require.”

. La. R.S. 30:29(E) states:
E. (1) In any civil action in which a party is responsible for damages or payments for the evaluation or remediation of environmental damage, a party providing evidence, in whole or in part, upon which the judgment is based shall be entitled to recover from the party or parties admitting responsibility or the party or parties found legally responsible by the court, in addition to any other amounts to which the party may be entitled, all costs attributable to producing that portion of the evidence that directly relates to the establishment of environmental damage, including, but not limited to, expert witness fees, environmental evaluation, investigation, and testing, the cost of developing a plan of remediation, and reasonable attorney fees incurred in the trial court and the department.
(2) In any civil action in which the department or the attorney general, or their employees, are parties or witnesses, provide evidence, or otherwise contribute to the determination of responsibility for evaluation or remediation, or the approval of a plan of remediation, the department or attorney general shall be entitled to recover from the party or parties admitting responsibility or the party or parties found legally responsible by the court all costs thereof, including but not limited to investigation, evaluation, and review costs; expert witness fees; and reasonable attorney fees.

. La. R.S. 30:29(J) provides:
J. (1) In the event that any settlement is reached in a case subject to the provisions of this Section, the settlement shall be subject to approval by the court. The department and the attorney general shall be given notice once the parties have reached a settlement in principle. The department shall then have no less than thirty days to review that settlement and comment to the court before the court certifies the settlement. If after a contradictory hearing the court requires remediation, the court shall not certify or approve any settlement until an amount of money suffi *1056 cient to fund such remediation is deposited into the registry of the court. No funding of a settlement shall occur until the requirements of this Section have been satisfied. However, the court shall have the discretion to waive the requirements of this Section if the settlement reached is for a minimal amount and is not dispositive of the entire litigation.
(2) In the event a settlement is agreed to between the parties in a case in which the department or the attorney general has intervened, such agency shall be entitled to recover from the settling defendants all costs, including investigation, evaluation, and review costs; expert witness fees; and reasonable attorney fees.

. La. R.S. 30:29(K) states: "The provisions of this Section shall not apply to a judicial demand that prior to the effective date of this Section has been resolved through compromise agreement and settlement of claims, or by judgment on the merits that has become final and definitive.”

. Id.., 2007-2371, p. 27; 998 So.2d at 35.

. Id., 2007-2371, p. 29; 998 So.2d at 36.

. M.J. Farms was in a pre-trial posture.

. See Id.., 2009-2368, p. 36-37; 48 So.3d at 259. The statements on which the defendants rely regarding Act 312 are actually the arguments presented to the court by Exxon.