CARAWAY, J.
_JjThe trial court dismissed a portion of the damage claims brought by plaintiff landowners in this so-called legacy litigation by application of the subsequent purchaser doctrine. The plaintiffs did not own the land until 2002. Their land remains subject to existing mineral leases and a mineral servitude. The partial judgment ruling of the trial court was certified for immediate appeal. We affirm the pre-purchase damages claim dismissal by the trial court’s ruling.

Facts and Procedural History

This case involves the same dispute that was before this court in Walton v. Burns, 47,388 (La.App.2d Cir.01/16/13), 151 So.3d 616 (“Walton I ”). The case centers around the plaintiff landowners’ claims for damages against the past and present mineral lessees and operators, as well as the mineral servitude owners, who were added to the suit by the Walton I ruling.
Robert Walton and Bonnie Walton purchased the land in 2002, and in 2003, the Waltons sold a portion of the property to John and Rebecca Lamm. The Waltons and the Lamms (hereinafter the “Landowners”) own no mineral interest in the property. The case involves two mineral leases in the Holly Ridge Oil and Gas Field in Tensas Parish, executed in the 1940s. The first lease on the property was granted by R.D. Shelley to Thomas J. Sandridge on November 25, 1940 (“Sandridge lease”). This lease was later assigned to Mobil, the predecessor of defendant ExxonMobil Oil Corporation (“Exxon”). Operations were conducted on the lease premises |2beginning in the 1940s. In April of 1978, the Sandridge lease was assigned to defendant McGowan Working Partners, Inc. (“McGowan”), which remains the present operator of the lease.
The second lease was granted on December 13, 1941, by R.D. Shelley to J.A. Wainwright (“Wainwright lease”). The Wainwright lease covered acreage adjacent to the Sandridge lease and was assigned to Stanolind Oil, the predecessor of defendant BP America Production Company (“BP”). The lease was maintained until its assignment to McGowan in 1976, and McGowan has operated wells on the Wainwright lease from that time until the present.
In 1980, the then-owner of the surface, Sher-Di-Je Land Co., Inc., entered into an agreement with McGowan. In consideration for $10,000, Sher-Di-Je agreed to waive any claim which it may have acquired from previous owners of the surface for damages resulting from prior op *493 erations and not previously remedied. Defendants, through their motion for summary judgment, argue that this agreement bound not only Sher-Di-Je, but also its successors and assigns, including the present plaintiffs. Therefore, Defendants argue that because of this agreement Plaintiffs are not entitled to any damages stemming from any claim for damages from oil and gas operations occurring pri- or to July 17, 1980.
In their original petition, the Landowners named only BP and Exxon, and the Waltons’ 2002 vendor of the land.[1] The Landowners alleged that |sthe property is “believed to be contaminated by the oil and gas exploration and production activities conducted or controlled by the oil company defendants [ ... ] pursuant to certain oil, gas, and mineral leases.” Plaintiffs filed a supplemental petition that added McGowan as a defendant, but none of the original allegations of fault and damages were expanded. Plaintiffs never made any specific allegations as to the dates of the acts causing the alleged contamination in their property other than to indicate that such acts began as far back in time as the outset of the mineral lease. Plaintiffs requested damages to conduct a scientific analysis of the contamination, to restore the property to its pre-polluted condition, punitive damages, unjust enrichment damages for the defendants’ unauthorized use of the property for waste disposal, stigma damages, mental anguish damages, any civil fruits derived from trespass, and loss of enjoyment damages. Apart from the allegation that the land is contaminated from the oil and gas activities of the Defendants, the Landowners did not state specific facts concerning the actual peeuni-ary and nonpecuniary damages suffered over the 75 years that the mineral leases have been operated.
Thus, to summarize, these allegations of the Landowners are directed at three categories of the defendants/appellees (hereinafter the “Defendants”): (1) the former leasehold owners, (2) the present leasehold owner and operator, and (3) the mineral servitude owners.
Additionally, we note that La. R.S. 30:29(B)(1) requires that:
[U]pon the filing or amendment of any litigation or pleading making a judicial demand arising from or alleging environmental damage, the provisions of this Section shall apply and the party filing same shall provide timely notice to |4the state of Louisiana through the Department of Natural Resources, commissioner of conservation and the attorney general.
All parties have indicated both in brief and in oral argument that the Landowners seek the regulatory cleanup damages of Act 312 of 2006, La. R.S. 30:29 (hereinafter “Act 312”). However, the petitions and other pleadings in the record do not reflect that the notification procedures mandated in La. R.S. 30:29(B)(1) have been met.
The Defendants filed multiple exceptions, including no right of action, and Exxon filed a motion for summary judgment, that all defendants adopted, arguing that the Landowners were not entitled to any relief in this action based on the subsequent purchaser doctrine. The Walton deed of acquisition of the property in 2002 did not purport to assign any rights of former owners of the land pertaining to the alleged contamination damage of the property.
*494 Prior to the first hearing in the trial court, the Landowners introduced into evidence the affidavits of multiple expert witnesses, including one who stated that the. prime source of the contamination was unlined earthen pits, used on the Holly Ridge property from at least the 1960s until at least the 1980s, spanning the time at which McGowan took control of the Wainwright and Sandridge leases, 1976 and 1978, respectively.
After the last hearing, the trial court issued two interlocutory judgments, addressing both the peremptory exceptions of no right of action and the motion for summary judgment pertaining to the Sher-Di-Je agreement. All judgments were partial judgments, dismissing only the | .^Landowners’ claims for “pre-purchase damages,” which are those damages that arose prior to 2002 when the Waltons first acquired the land (hereinafter the “Pre-Purchase Damages”). The Landowners moved to have the partial judgments certified under La. C.C.P. art. 1915(B) as final for purposes of appeal. The motion was granted, and the partial judgments were combined into a single final judgment that resulted in this appeal.

Discussion

The central issue in this appeal concerns the Landowners’ rights to claim Pre-Pur-chase Damages from various Defendants. Some presently own mineral rights which burden the property, while other defendants, BP and Exxon, formerly owned the leases at the time of alleged acts of contamination of the property. The dismissal of the Landowners’ claims for Pre-Pur-chase Damages against all Defendants was based upon the so-called subsequent purchase doctrine as addressed in Eagle Pipe & Supply, Inc. v. Amerada Hess Corp., 10-2267 (La.10/25/11), 79 So.3d 246.
Notably, the Defendants’ peremptory exceptions sought a complete dismissal of the Landowners’ suit altogether. Yet, the trial court only rendered a partial judgment under La. C.C.P. art. 1915(B) and certified that judgment for appeal without detailed written reasons. Such a partial no-right-of-action dismissal of the Pre-Purchase Damages claims requires this court to review the propriety of the judgment under the test of R.J. Messinger, Inc. v. Rosenblum, 04-1664 (La.3/2/05), 894 So.2d 1113. Among other things, Mes-singer requires that the relationship between the adjudicated claim for Pre-Pur-chase Damages and the unadjudicated claims |fifor other damages and remedies be examined. Therefore, the trial court’s partial dismissal of the Landowners’ claims must be substantively and procedurally measured in this appeal.
At oral argument and in their post-argument brief, Defendants concede that the trial court’s dismissal of the Pre-Purchase Damages by application of the subsequent purchaser doctrine has not “deprived the [Landowners] of their rights to a regulatory cleanup of the property,” which we view as including the remediation of the land to a standard that protects the public and private interests under Act 312, La. R.S. 30:29; State v. Louisiana Land & Exploration Co., 12-0884 (La.1/30/13), 110 So.3d 1038. With the language of the partial judgments directed only at the dismissal of the Pre-Purchase Damages, the remediation remedy to fund a feasible plan for cleanup under Act 312 remains one of the unadjudicated claims in this action. More specifically, the trial court’s certified partial judgment did not peremptorily dismiss from this suit any of the Defendants in the separate categories, the former leasehold owners, the present operator, or the mineral servitude owners. The Landowners’ rights to a regulatory cleanup of the property therefore remain in this action as *495 asserted causes of action against all Defendants.
We will first summarize and review the legal principles as set forth in Eagle Pipe, the Louisiana Supreme Court jurisprudence concerning the so-called legacy litigation,[2] and Act 312, along with our holding in Walton I.
17There are two most relevant factors in this case which are important for an analysis of this legacy dispute in comparison to the prior jurisprudence. First, the Landowners, who acquired the land in 2002, had no direct contractual privity with Defendants or their predecessors in the creation of the mineral leases and mineral servitude rights. They acquired ownership of the land in 2002 which had previously been burdened by these mineral rights. Their land is subject to a mineral servitude interest affecting all of the mineral interest. Second, the two mineral leases are still held by production and have not terminated. Additionally, the mineral leases contain no provisions expressly addressing the extent of surface use or the restoration of the lease premises.

Relevant Law Regarding Legacy Litigation

The mineral leases and mineral servitude burdening the ownership of land are incorporeal immovables and real rights. La. R.S. 31:16 and 18. Both ^ie mineral lease and the mineral servitude burden the ownership of the land with an identical right of use to explore for and produce minerals. La. R.S. 31:114 and 21. Such right of use of the owners of the incorporeal immovables is a charge upon the ownership of the land, making the ownership of land a virtual servient estate. La. R.S. 31:11, Official Comment, and La. C.C. art. 646. .The owners of land burdened by a mineral right or rights and the owner of a mineral right must exercise their respective rights with reasonable regard for those of the other. La. R.S. 31:11.
|sThe charge or burden upon the ownership of land in favor of the owners of mineral rights does not overwhelm the landowner’s concurrent right to other economic utilization of the surface of his property. La. R.S. 31:11 and Official Comment. If the mineral lessee has acted unreasonably or excessively under the lease or without reasonable regard for the landowner’s concurrent right of use of the land, the landowner as the owner of the servient estate may seek redress to restore his right of use. La. R.S. 31:11 and 122; State v. Louisiana Land, supra.
In Walton I, we allowed some of the present defendants who are owners of the mineral servitude affecting this property to be joined in this action. The Mineral Code principles for correlative rights and restoration of the servient estate served as the basis for that ruling. La. R.S. 31:11 and 21.
With Act 312, a procedural remedy was enacted for remediation of environmental damage of land against the party or parties who caused the damage or who are otherwise legally responsible therefor. La. R.S. 30:29(C). The “environmental damage” as defined in Act 312 pertains to “contamination resulting from activities associated with oilfield sites or exploration and production sites.” La. R.S. 30:29(I)(2).
Under Act 312, property must only be remediated to applicable regulatory standards following a site-specific, defendant-funded, court-approved, and court- *496 supervised remediation plan. Marin v. Exxon Mobil Corp., 09-2368 (La.10/19/10), 48 So.3d 234, 259; State v. Louisiana Land, supra. The restoration obligations arising from unreasonable and excessive operations under a mineral lease and causing environmental damage are 19owed during the existence of the mineral lease and do not arise merely at the termination of the lease. Marin at 255; State v. Louisiana Land, supra.
The Louisiana Supreme Court has also addressed the issue of tort liability in a legacy case. In Marin, the Marin family sued the mineral lessee for remediation damage to restore the soil and groundwater which had been contaminated. The oil and gas lease, which was still active, had been granted by plaintiffs’ father in 1936. The injury to the soil and groundwater had resulted from oilfield wastes deposited in unlined earthen pits, a practice which had ceased more than a decade before the suit. Under those facts, the court rejected plaintiffs’ claim that tortious conduct had occurred and was continuing until the time of suit. The court reasoned that a “continuing tort is occasioned by unlawful acts, not the continuation of the ill effects of an original, wrongful act.” Marin at 253, citing Crump v. Sabine River Authority, 98-2326 (La.6/29/99), 737 So.2d 720. Since the polluting acts with the unlined pit deposits had ended years before, the tort claims of the Marins were not recognized as continuing torts and were dismissed on the basis of prescription.
The Supreme Court’s analysis of the Marins’ tort claim, however, was not the end of the matter. Because of the continued existence of the defendant’s oil and gas lease, the plaintiffs prevailed for remediation damages against the defendant for its unreasonable and excessive operations of the lease. Although the Act 312 remedy was not applied retroactively in the Marin suit,[3] the court indicated that the money damages awarded in |10Marin would equate with remediation damages necessary to fund a court-approved plan under Act 312.
In State v. Louisiana Land, supra, the Supreme Court was asked to address Act 312 regarding the various awards for damages which a plaintiff might seek in a legacy action. Citing Subsection H of Act 312 (La. R.S. 30:29(H)), the court broke down different categories of damages as follows:
Subsection H states that the procedure enacted by this Section shall not preclude a landowner from pursuing a judicial remedy or receiving a judicial award for private claims, other than those remediation damages necessary to fund the feasible plan to remediate the land to a standard that protects the public interest, i.e. “except as otherwise provided in this Section.” If a court awards remediation damages pursuant to an express contract provision that is a greater amount than that ordered to be placed into the court’s registry to fund the remediation plan, then the landowner is entitled to those “excess” remediation damages. Likewise, “any award” for “additional remediation” may be kept by the landowner, as well. If the money judgment for remediation exceeds the amount necessary to fund the plan, the plaintiff is granted a personal judgment for the “excess” remediation damages; plaintiff is also granted a personal judgment on his other non-remediation private claims (if he prevailed on such claims at trial).
*497 Id. at 1054. Additionally, in the concurring opinion of Justice Guidry in State v. Louisiana Land, he summarized the plaintiffs possible private damage claims in a legacy case as follows:
Moreover, the statute does not disturb the plaintiffs’ right to pursue damages for private, non-remediation claims suffered as a result of the environmental damage, and the defendant’s negligent conduct or breach of contract, including, for example, loss of income, stigma damages, diminution of property value, mental anguish, pain and suffering, nuisance, loss of use and enjoyment, and punitive damages where permissible under the law. See La. Rev. Stats. 30:29D(1) and 30:29H.
Id. at 1062.
In Eagle Pipe, supra, the Supreme Court addressed the subsequent purchaser doctrine and explained:
The subsequent purchaser rule is a jurisprudential rule which holds that an owner of property has no right or actual interest in recovering from a third party for damage which was inflicted on the property before his purchase, in the absence of an assignment or subrogation of the rights belonging to the owner of the property when the damage was inflicted.
Id. at 256-257.
In Eagle Pipe, because of the subsequent purchaser rule, the landowner was found to have no right of action against defendants. Those defendants had never owned an interest in the property, but had negligently and tortiously damaged the property by their actions before the time that plaintiff had acquired the land. Significantly, the court found that the dispute did not stem from a real right regime of ownership, involving conflict between the owners of a dominant and servient estate over the abuse of land. Id. at 280-281. Therefore, plaintiff was not asserting any right as the owner of a servient estate to restore the premises, but only its predecessor’s personal damage claims for which plaintiff had no right of action.

Propriety of the Partial Judgment

All Pre-Purchase Damage claims against all Defendants in this case were dismissed by a partial judgment on the Defendants’ exception of no right of action.
The function of the exception of no right of action is to determine whether the plaintiff belongs to the class of persons to whom the law grants the cause of action asserted in the suit. Hood v. Cotter, 08-0215 (La.12/2/08), 5 So.3d 819, 829. An appellate court reviewing a lower court’s ruling on an exception of no right of action should focus on whether the particular plaintiff has a right to bring the suit and is a member of the class of persons that has a legal interest in the subject matter of the litigation, assuming the petition states a valid cause of action for some person. Id.; Badeaux v. Southwest Computer Bureau, Inc., 05-0612 (La.3/17/06), 929 So.2d 1211, 1217; Turner v. Busby, 03-3444 (La.9/9/04), 883 So.2d 412, 415-416; Reese v. State, Dept. of Public Safety & Corrections, 03-1615, (La.2/20/04), 866 So.2d 244, 246.
The determination whether a plaintiff has a right to bring an action raises a question of law. A question of law requires de novo review. Holly & Smith Architects, Inc. v. St. Helena Congregate Facility, Inc., 06-0582, (La.11/29/06), 943 So.2d 1037, 1045.
Relying on Eagle Pipe, the trial court dismissed the money damage or personal claims arising from unreasonable and excessive lease operations by some of the defendants which occurred years before the Landowners purchased the property. According to the ruling, such past opera *498 tions gave rise to a personal right and cause of action at the time the environmental damage to the land was inflicted. Therefore, the present Landowners have no right of action for the personal right claims of their predecessors-in-title to land.
For appellate review of this partial judgment, there are three important alleged facts and factual consequences for our consideration. These factors are either expressed or inferred from very broad (and arguably | isvague) allegations of the Landowners’ petitions, but nevertheless underlie the parties’ arguments for this peremptory, pretrial ruling. First, most, if not all, of the alleged excessive and unreasonable operations under the mineral leases occurred many years before the Landowners acquired ownership in 2002. Second, although unspecified in the Landowners’ petitions, contamination of the soil and water would have begun the ill effects and resulting damages years prior to 2002. Third, the Landowners’ present use of the land is impacted and impeded by the alleged ongoing and damaging nuisance relating to the environmental contamination of the property.
From these three facts and in the language employed for analysis of a continuing tort, the original, wrongful acts from operations of these leases (Factor 1) ended years before 2002. The ill effects of that environmental injury resulted at the time of the early acts of contamination (Factor 2), yet continued after the Landowners’ acquisition of ownership (Factor 3). The trial court’s partial judgment effectively dismissed the claims and money damages under Factor 2 which were the personal claims of the prior owners of the property at the time the wrongful acts occurred or, at least, before 2002. We do not find in the Landowners’ petitions specific allegations of those damages involving economic loss or mental anguish occurring before 2002. Nevertheless, the allegations that the wrongful conduct occurred imply that those damages were experienced by the former owners of the property. Therefore, under the subsequent purchaser doctrine, as applied in | uEagle Pipe,twe affirm the ruling that the Landowners have no right of action to assert claims for those Pre-Purchase Damages.[4]
The court in Marin found that any tort claim for the actual waste discharged upon the land arose at the earlier time when that wrongful act occurred. Such tort claim had prescribed and did not amount to a continuing tort. Marin, supra. That same logic in this case means that the Landowners’ tort claims for Pre-Purchase Damages which are now dismissed were the personal rights and claims of the former surface owners.
Nevertheless, the Marin ruling allowed the landowners’ recovery under the Ma-rins’ mineral lease for the existing and continuing violation of the obligations owed to the servient estate. Similar claims remain unadjudicated in this case, and we find them separate and distinct as post-purchase damage claims and remedies for the Landowners to pursue on remand. As the owners of the servient estate subject to the mineral rights of the Defendants, the Landowners have asserted that the Defendants are the parties that are legally responsible for remediation damages necessary to fund the feasible remediation plan under Act 312 to protect the public interest and restore the Landowners’ concurrent use of the property. Unlike the dis *499 pute in Eagle Pipe, the present condition of the land continues to implicate the leasehold obligation to remediate and restore the concurrent use of the Landowners because of the parties’ existing real right regime governed by the Mineral Code. La. R.S. 31:11. The trial court’s partial [ ^judgment therefore properly found that the subsequent purchaser doctrine did not apply to all of the Landowners’ claims.

Conclusion

For the foregoing reasons, the partial judgment of the trial court dismissing Plaintiffs’ claims for pre-purchase damages is affirmed. Costs of this appeal are assessed to Plaintiffs.
AFFIRMED.
GARRETT, J., concurs with written reasons.

. The vendor, Monclova Plantation, has not participated in the filing of exceptions and proceedings at the lower court. The claims of the Landowners against Monclova are in red-hibition based on the 2002 sale, and are not related to the current claim addressed in this appeal.

. This "legacy" refers to environmental damage to property from prior oil and gas exploration activities alleged in suits following the ruling in Corbello v. Iowa Production, 02-0826 (La.2/25/03), 850 So.2d 686.

. Section 3 of Act 312 states: "The provisions of Section 1 of this Act shall not apply to any case in which the court on or before March 27, 2006, has issued or signed an order setting the case for trial, regardless of whether such trial setting is continued.”

. Since a portion of the Pre-Purchase Damages was the subject of the 1980 Sher-Di-Je agreement, the trial court's granting of the partial motion for summary judgment is also affirmed.