MOORE, J.
*695 Drs. J. Houston and Deborah K. Bosley appeal a judgment that awarded them only $29,632.28 for property damages to their home arising from the negligence of their roofing contractor, Oliphint Enterprises LLC, in allowing rainwater to get in the house, and denied their claim for a penalty and attorney fee against Oliphint's insurer, United Fire & Indemnity, for allegedly failing to adjust the claims properly. We amend in part, to increase the award for exterior painting, but otherwise affirm.
FACTUAL BACKGROUND
The Bosleys (he is an ENT, she an endocrinologist) own a home in Shreveport's Pierremont area. In 2011 they were remodeling to add an ADA-compliant wing and replace the entire roof. They bought a custom-made metal roof and hired Corey Oliphint, of Oliphint Enterprises, to install it. Because of the size of the roof and the need to work around the other construction, the roof project was intricate, taking about three months.
In late August, Oliphint had removed a large portion of the roof over the older portion ("east wing") of the house. On the afternoon of August 24, a sudden and unexpected thunderstorm blew in, the first rainfall in about three months, while this part of the roof was off. Workers struggled to cover the gap with tarps, but they did not have enough. A torrent of violent rain pounded the unprotected attic, drenching the ceilings of two bedrooms (the "green room" and the "blue room") and dampening the interior walls of those rooms, the library and the hall. Oliphint's crew set out buckets and fans to alleviate the situation, but Ms. Bosley, who was chiefly overseeing the remodel, testified that she was immediately concerned about the risk of mold growing in the wallboard and insulation.
The next day, August 25, Oliphint notified his general liability carrier, United Fire, of the incident; United Fire sent an adjuster, James Thomas, who came to the house on August 29 and saw evidence of water intrusion. Thomas testified that he prepared a repair estimate after receiving a report from Charles Martin, of Sunbelt Contractors, whom Ms. Bosley had contacted. Martin's estimate, $15,794.26, was just to gut and redo the blue and green rooms. Making an adjustment for repairing exterior soffits and fascia board, and for minor repairs to the library, Thomas figured the loss at $17,358.76; after depreciation, he wrote a net estimate of $16,648.13. The estimate was dated October 21, but he did not give it to Ms. Bosley until October 28.
Ms. Bosley and Thomas gave somewhat differing accounts of their October 28 meeting, but both agreed that he did not give her any written offer, only an oral estimate. Ms. Bosley testified that Thomas offered her the $16,648.13, but only if she would sign a complete release of liability, which she was unwilling to do. In the two months since the incident, she engaged other contractors to look at the damage, which she feared was more extensive than originally thought. Specifically, a mold and moisture analyst had advised her to replace all insulation and clean all HVAC ductwork, just in case; Clean Air Systems, a contractor, quoted this work at $20,680.58. According to Ms. Bosley, Thomas replied that if she found additional damage, she could ask United Fire for reconsideration, but she "understood" that Thomas wanted her to gut the walls at her own expense, and if no mold was found, United Fire would not pay for the walls.
*696 Thomas testified that because the Bosleys were not the insureds under Oliphint's policy, United Fire was obligated to offer them only actual cash value of the loss and could require them to sign a full release before payment. He recalled that she declined the oral offer not only because she disliked the release, but because with the west wing still under construction and all their furniture moved into the east wing, they had too much activity going on to gut and redo the green and blue rooms at that time. He also told her that gutting the walls of those rooms was part of his estimate; even if no mold was found, that work was included. At any rate, they reached no agreement. No work was ever done except to remove wet insulation from the attic.
By early 2012, Ms. Bosley thought she saw a small area of black mold behind a picture frame. ALTEC, an environmental consultant, found the air samples normal for mold and fungus, but warned of a potential for mold growth because of extensive water staining on the blue room ceiling. Thomas testified that he upgraded his estimate to $20,436.74, but this still did not include any mold remediation. Ms. Bosley testified that she would not accept this because it came nowhere near covering her damage.
The Bosleys filed this suit on August 23, 2012, naming Oliphint as defendant. They alleged their damages were around $35,000, and that United Fire refused to negotiate. Later, they amended their petition to add United Fire as defendant and to request penalties and attorney fees for failure to adjust the claim as required by La. R.S. 22:1892 A(4).[1]
On the evening of Christmas Eve, 2013, the Bosleys came home during a heavy storm and discovered that it was "raining inside" the green room, with water streaming from the top of the wall, around the Pella window, and onto the floor. With an HVAC contractor, Mr. Bosley climbed into the attic to inspect, and discovered a gap, some 3/8 inch wide and 12 feet long, between the bottom flange of the metal roof and the outer wall fascia. They called Oliphint back to the house; he admitted the gap was there, but insisted it was not the roofing contractor's duty to seal this, but rather the painting contractor's. Oliphint also found a huge pile of leaves and twigs in the storm gutter, which caused the water to back up and allowed a downspout to separate from the gutter. He felt that if the roof and gutter had been properly maintained, there would have been no second intrusion.
Thomas also came to inspect, but he felt the damage was not Oliphint's fault and thus he made no offer to adjust the window and other damage to the green room.
In June 2014, the Bosleys amended their petition to add allegations concerning the second intrusion. They contended that all damages were related to the negligent work performed by Oliphint in August 2011.
The matter came to trial over four nonconsecutive days in February and March 2016. The Bosleys, Oliphint and Thomas all testified as noted above. Several expert witnesses testified about mold testing and remediation, issues not contested on appeal.
The Bosleys called several contractors. Their lead witness was Brian Smith, of Brian Builders, in Bossier City. Smith considered the house a "historic older home"
*697 and carefully described everything that Ms. Bosley "wanted fixed," but did not independently assess how much of her wish list was necessitated by the water intrusions. He gave a first estimate of $29,227.83, including mold remediation, and a second estimate of $18,912.47, without. He candidly admitted that his estimates were about three times higher than other contractors', but cited the high wages he paid his workers. Specific to the appeal, he testified that the windows in the blue and green rooms would not open, and the only way to remedy this was to remove, disassemble, attempt to repair, and then reinstall them, at a cost of $7,500 for the green room and $4,500 for the blue room.
Thomas Block, a general contractor, testified that he had painted the Bosleys' house prior to August 2011, using ArmorCoat, the most expensive paint money can buy. The only thing that would make this paint fail, he testified, was water intrusion from a defective roof; otherwise, it should have lasted 25 years. He originally proposed to repaint the entire outer wall for $8,800, but then said he could redo just the affected area, for $5,600.
United Fire called Benjamin "Chase" Pittman, an estimator with Federal Construction Co., who analyzed the repairs necessitated by water intrusion and quoted $17,877.35. He allocated no cost to replace the windows because there was "no visible damage," or to use high-quality paint on the exterior. He commented that his estimate was quite close to Sunbelt's ($17,358) and that Brian Builders' was extremely high.
ACTION OF THE DISTRICT COURT
The district court rendered a 10-page ruling. After identifying the parties and briefly stating how the damage occurred, the court declared Brian Smith to be "totally un-credible" and rejected his charges based on a wish list instead of necessary repairs. The court then summarized each witness's testimony, in the process rejecting Block's estimate of $8,800 to paint 10 square feet of exterior wall. By contrast, the court found Martin, Pittman and Thomas to be remarkably consistent, and stated that it would accept Pittman's quote, with adjustments. The court then found that both water intrusions were the result of Oliphint's negligence.
Having determined causation, the court then applied its adjustments, starting with Pittman's quote of $17,877.35, adding sums for removal of insulation, replacement of exterior fascia and soffits, and some mold remediation, for a total of $29,632.28.
Finally, the court ruled, without elaboration, that "it did not appear" that United Fire acted in bad faith, or was arbitrary or capricious in handling the claim. The court therefore denied the claim for penalty and attorney fee.
The court rendered judgment in accordance with the ruling, in favor of the Bosleys and against Oliphint and United Fire, for $29,632.28.
The Bosleys moved for new trial solely on the issue of the penalty and attorney fee, arguing that the district court incorrectly required them to show bad faith, a standard not required by La. R.S. 22:1892 A(4), and that even if the court had applied the correct standard, it erred in not finding that United Fire's actions were arbitrary, capricious and without probable cause. After hearing arguments on the issue, the court ruled orally that the adjuster was on the site three days after the first incident, there was "communication about hold up, we're not ready to do anything yet," as well as some "misunderstanding or misinterpretation by some of the parties," with the result that the insurer's conduct *698 was not arbitrary, capricious or without probable cause. As to the second incident, the court agreed that it had rejected Oliphint's view of which party was responsible for sealing the roof to the house, but a mere "difference insofar as opinion" did not violate the statute. The court denied the new trial, and the Bosleys appealed devolutively, raising three assignments of error.
DISCUSSION
Statutory Penalty and Attorney Fee
By their first assignment, the Bosleys urge that the court erred in denying their claim for penalties and attorney fees under La. R.S. 22:1892, as United Fire's actions were arbitrary, capricious and without probable cause as a matter of law. They concede that § 1892 is punitive and must be strictly construed, but they raise two arguments. With respect to the first water intrusion, they quote Paragraph A(4): "All insurers shall make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim." They show that United Fire has never asserted lack of satisfactory proof of loss. Thomas, the adjuster, got notice on August 29, and saw the obvious water damage; he received an estimate from Sunbelt on September 8, but then did not write his own estimate until October 21, and did not give it to the Bosleys until October 28. They argue that this is patently past the 30-day limit of § 1892 A(4), and that Thomas offered no excuse for the delay. They further argue that just because an adjuster is "not comfortable" with a claim or asserts a generic dispute is no justification for noncompliance with the statute, Louisiana Bag Co. v. Audubon Indem. Co. , 2008-0453 (La. 12/2/08), 999 So.2d 1104 ; Landry v. State Farm , 529 So.2d 417 (La. App. 1 Cir. 1988). They concede that the insurer may dispute the extent of damage, but assert that it still must unconditionally tender the undisputed portion, Burton v. Foret , 484 So.2d 753 (La. App. 1 Cir.), aff'd on other ground , 498 So.2d 706 (1986). They also contend that an offer contingent on a complete release of liability is not a tender under § 1892, Landry v. State Farm, supra .
With respect to the second water intrusion, they quote Paragraph A(3): "Except in the case of catastrophic loss, the insurer shall initiate loss adjustment of a property damage claim * * * within fourteen days after notification of loss by the claimant." They contend that Thomas came to the house shortly after the event but never made any attempt to adjust the claim. Finally, they show that Paragraph A(3) applies to third-party claimants, not just to insureds, Deimel v. Dewhirst , 99-465 (La. App. 5 Cir. 11/10/99), 750 So.2d 1055, writ denied , 99-3478 (La. 2/11/00), 754 So.2d 941. They pray for an award of the penalty and attorney fee allowed by § 1892 B(1), but they do not specify any amount.
United Fire quotes § 1892 A(4), but also relies on Paragraph B(1), under which a breach is penalized only if the failure to make a written offer is "arbitrary, capricious, or without probable cause." It concedes that Thomas made no written offer to the Bosleys within 30 days of satisfactory proof of loss, but argues that he made an oral offer , thus negating any claim that its conduct was arbitrary, capricious or without probable cause.[2] It also argues that an insurer is not required to make an unconditional tender to a third-party *699 claimant, Mallett v. McNeal , 2005-2289 (La. 10/17/06), 939 So.2d 1254 ; Riser v. Shelter Mutual Ins. Co. , 43,617 (La. App. 2 Cir. 10/29/08), 997 So.2d 675. It further asserts that Ms. Bosley constantly told Thomas that she would not settle, and the insurer is not required to perform a vain and useless act, Coleman-Lyons 2800 v. Bryan , 566 So.2d 665 (La. App. 2 Cir. 1990). It also contends that Thomas's act of presenting the release to Ms. Bosley can be construed as a written offer to settle, thus satisfying Paragraph A(4).
As to the second water intrusion, United Fire urges that Oliphint and Thomas both promptly came to the house, inspected, and determined that the event had nothing to do with Oliphint's workmanship, so no further action was required of United Fire.
The payment and adjustment of claims under policies other than life and health and accident is regulated by La. R.S. 22:1892,[3] which provides, in pertinent part:
A. * * * (3) Except in the case of catastrophic loss, the insurer shall initiate loss adjustment of a property damage claim * * * within fourteen days after notification of loss by the claimant. * * *
(4) All insurers shall make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim.
B. (1) Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor or failure to make a written offer to settle any property damage claim, including a third-party claim, * * * as provided in Paragraphs A(1) and (4) of this Section, * * * when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of fifty percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater[.]
In short, § 1892 sets forth affirmative duties for insurers and prescribes penalties for their breach. Katie Realty Ltd. v. Louisiana Citizens Prop. Ins. Corp. , 2012-0588 (La. 10/16/12), 100 So.3d 324. The statute explicitly applies to third-party claims, but requires only a written offer to settle; an insurer "has no duty to make an unconditional payment to a third party" under the statute. Mallett v. McNeal, supra ; Riser v. Shelter Mutual Ins. Co., supra ; Cochran v. Safeway Ins. Co. , 13-688 (La. App. 3 Cir. 12/11/13), 128 So.3d 1286. Certain cases cited by the Bosleys as requiring an unconditional tender actually involved claims by an insured against his own insurer, and are thus inapposite.[4]
The duty to initiate loss adjustment means the insurer must take some substantive and affirmative step to accumulate the facts necessary to evaluate the claim. Block v. St. Paul Fire & Marine Ins. Co. , 32,306 (La. App. 2 Cir. 9/22/99), 742 So.2d 746. Simply opening a file, or making and receiving phone calls, have been held insufficient to qualify as initiating loss adjustment. Joubert v. Broussard , 02-911 (La. App. 3 Cir. 12/11/02), 832 So.2d 1182, writ denied , 2003-0060 (La. 3/21/03), 840 So.2d 552 ; Rogers v. Commercial Union Ins. Co. , 01-443 (La. App. 3 Cir. 10/3/01), 796 So.2d 862. A thorough investigation *700 within 14 days is not required. Toerner v. Henry , 2000-2934 (La. App. 1 Cir. 2/15/02), 812 So.2d 755, writ denied , 2002-1259 (La. 8/30/02), 823 So.2d 951.
Moreover, R.S. 22:1892 is penal in nature and must be strictly construed. Sher v. Lafayette Ins. Co. , 2007-2441 (La. 4/8/08), 988 So.2d 186 ; Cooper v. Farmers Ins. Exch. , 50,978 (La. App. 2 Cir. 11/23/16), 210 So.3d 829. The phrase "arbitrary, capricious, or without probable cause" is synonymous with "vexatious," and describes an insurer whose willful refusal of a claim is not based on a good-faith defense. Louisiana Bag Co. v. Audubon Indem. Co., supra ; Riser v. Shelter Mut. Ins. Co., supra . However, the claimant is not required to show that the insurer acted in bad faith. Oubre v. Louisiana Citizens Fair Plan , 2011-0097 (La. 12/16/11), 79 So.3d 987.
The district court did not favor us with factual findings on the critical question of why United Fire's failure to give the Bosleys a written offer within 30 days was not arbitrary, capricious or without probable cause.[5] However, the record fairly illuminates the ultimate decision to deny the penalty. As to the first incident, Thomas testified that Ms. Bosley repeatedly told him she did not want to repair the water damage at that time because she had so much other construction work going on in the house; Ms. Bosley even admitted she preferred to put off repairs until she was able to move her furniture into the new wing. In short, her attitude may have influenced Thomas's somewhat relaxed approach to the claim. When Thomas finally gave her the estimate, she declined to settle, not because the offer was untimely, but because she was afraid of finding more damage and did not want to sign a full release. These concerns were reasonable, but her reluctance to settle at any time militates against a finding that United Fire's conduct was arbitrary, capricious or without probable cause. From the cold record, United Fire's conduct appears noncompliant, but far from vexatious. We perceive no manifest error.
As to the second incident, Oliphint came to the house shortly after Christmas and found that the intrusion resulted from the Bosleys' failure to clear excess leaves and twigs from their gutter and roof and from the painting contractor's failure to seal the fascia to the roof flange. Although the record does not clearly establish the time frame, Thomas also went to the house to inspect; relying on Oliphint's own findings, he also found that Oliphint's work was not responsible for the damage. These facts support the finding that United Fire took substantive and affirmative steps to accumulate the facts necessary to evaluate the claim, even though the district court ultimately rejected both men's opinions. United Fire's initial decision to deny the claim may have been wrong, but on this record, it was not arbitrary, capricious or without probable cause. On this record, we perceive no manifest error. The first assignment of error lacks merit.
Exterior Paint
By their second assignment of error, the Bosleys urge the court erred in limiting their award for exterior repair to only three gallons of paint and not allowing them to use their original painter, Thomas Block, and specialty paint, ArmorCoat. They concede that manifest error applies, but argue they are entitled to full indemnification under La. C.C. art. 2315, Roman Catholic Church v. Louisiana Gas Serv. Co. , 618 So.2d 874 (La. 1993). They *701 argue that restoration is the measure of damages, and our law "approximates" the standard expressed in the Restatement (Second) of Torts, Roman Catholic Church v. La. Gas Serv., supra . They also suggest that restoration costs may exceed market value, Mayer v. McNair Transp. Inc. , 384 So.2d 525 (La. App. 2 Cir. 1980), and should be rejected only if exorbitant, Roman Catholic Church v. La. Gas Serv., supra . They pray for an award of Block's estimate, $5,600.
United Fire responds that the district court simply did not abuse its discretion in finding Block's estimate of $5,600 to repaint two small areas of exterior siding extremely inflated.
Every act of man that causes damage to another obliges him by whose fault it happened to repair it. La. C.C. art. 2315. One injured through the fault of another is entitled to full indemnification for the damages caused thereby. State v. Louisiana Land & Expl. Co. , 2012-0884 (La. 1/30/13), 110 So.3d 1038, and citations therein . When property is damaged through the legal fault of another, the primary objective is to restore the property as nearly as possible to the state it was in immediately preceding the damage. Id. Generally, courts have considered the cost of restoration as the proper measure of damage where the thing damaged can be adequately repaired. Id. ; Loutre Land & Timber Co. v. Roberts , 45,355 (La. App. 2 Cir. 7/27/11), 72 So.3d 403, writ denied , 2011-1846 (La. 12/2/11), 76 So.3d 1177.
Block testified that he had painted the entire house with ArmorCoat paint sometime before the second incident. He said ArmorCoat was a "specially formulated paint that I actually own," had superior benefits (10 times thicker than normal paint, extremely waterproof, "breathable," and lasts 25 years), and required special effort to prepare the surface and apply the paint. There was absolutely no record evidence to show that a "spot repair" with ordinary hardware-store paint would restore the beauty and level of protection afforded by ArmorCoat. It was a clear abuse of discretion for the court not to award the cost to restore the outer wall to its prior condition.
Although Block's estimate struck the district court as high, the case is analogous to the apartment building that was destroyed by fire in Roman Catholic Church v. La. Gas Serv., supra . Even though the diocese had bought the building for $1.7 million, it had spent roughly $3 million in renovations. After the devastating fire, the district court awarded the diocese only the fair market value of the building, and the court of appeal affirmed. Citing the undisputed evidence of the cost and quality of the renovations, and the legal standard of restoration (less depreciation), the court amended the judgment to award restoration cost. We will do the same here.
Block testified that repainting the area around the bay/bow window, overhang, windows and siding, including removing and reinstalling the gutter, with ArmorCoat would cost $5,600. Applying a reasonable depreciation of 6%, and deducting the $250 already awarded by the trial court to spot repair with common-grade paint, we amend the judgment to award an additional $5,100 for exterior painting.
Window Repair
By their third assignment of error, the Bosleys urge the district court erred in failing to award damages to remove and rework the windows in the blue and green rooms that were damaged in the water intrusions. They again assert their right to complete indemnification, and stress the testimony of their contractor, Brian Smith, that to restore the windows to "original condition" he would have to *702 remove, disassemble, repair or replace, and reinstall them, at a cost of $7,500 and $4,500, respectively. They also cite Ms. Bosley's testimony that she had refurbished all windows shortly after they bought the house, in 1992, and that they were still working fine right before August 2011; by contrast, they argue that Pittman and Martin, on whom the court relied, may have found no "visible damage" but they did not try to open the windows. The Bosleys submit this evidence undermines the district court's finding and supports an award of $12,000.
United Fire responds that the court simply did not abuse its discretion in rejecting the claim for the windows, as there was significant evidence that they were sticky and unmanageable before the water intrusions. It also shows that several witnesses testified that the new foam insulation, installed by the Bosleys in the fall of 2011, trapped moisture in the house, caused condensation on the windows, and more probably than not caused the wood to swell. The only witness to testify otherwise, United Fire contends, was Smith, whom the district court found utterly unbelievable.
The standard of appellate review of factual determinations is the manifest error-clearly wrong standard, which precludes setting aside a trial court's finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety. Hayes Fund for First United Methodist Church v. Kerr-McGee Rocky Mountain LLC , 2014-2592 (La. 12/8/15), 193 So.3d 1110, and citations therein . The reviewing court cannot rely on some evidence that supports or controverts the trial court's finding; it must review the entire record to determine whether the finding is clearly wrong or manifestly erroneous. Id. The issue to be resolved on appeal is not whether the trial judge was right or wrong, but whether the judge's factfinding conclusion was reasonable. Id. ; Jackson v. Royal T Energy LLC , 50,645 (La. App. 2 Cir. 6/22/16), 197 So.3d 706, writ denied , 2016-1383 (La. 11/7/16), 209 So.3d 99.
Although it seems intuitive that water intrusion would make the windows swell and stick, we are constrained to note that several witnesses ascribed the problem, at least in part, to the foam insulation, installed in 2011. The Bosleys' HVAC contractor, John Fertitta, testified that foam insulation traps moisture in the house, allows condensation on the windows, and should be controlled by a variable-speed HVAC unit. The Bosleys' construction consultant, John Worthey, confirmed this explanation and testified that he saw sweat and mildew on the windows when he inspected them in June 2014; he attributed this to the insulation and poor thermal exchange. The Bosleys' environmental consultant, David Hopper, found 79% relative humidity in the east wing when he inspected in April 2012; the outdoor humidity was only 71% at the time. United Fire's engineer, Jeffrey Peters, confirmed that foam insulation in the attic often makes windows sweat. On this evidence, we cannot say the district court's finding of causation is plainly wrong. We also note Ms. Bosley's admission, on direct examination, that in the fall of 2013, the windows "could be raised and lowered. Whether or not I'd say easily, they are ancient windows and I had to track them." While not determinative, this testimony supports the district court's implicit finding that the windows were perhaps already less than perfect before the water intrusions. In short, we perceive no manifest error.
This assignment of error lacks merit.
CONCLUSION
For the reasons expressed, the judgment is affirmed insofar as it denied the *703 plaintiffs' claims for a statutory penalty and attorney fee, and for the cost of removing and reworking the windows in the blue and green rooms. The judgment is amended, however, to award the full cost of paint and repair to restore the exterior to its condition prior the water intrusion, less depreciation and partial damages already awarded, or $5,100. It is ordered, adjudged and decreed that there be judgment herein in favor of the plaintiffs, J. Houston Bosley, M.D., and Deborah K. Bosley, and against the defendants, Oliphint Enterprises LLC and United Fire & Indemnity Co., in the full sum of thirty-four thousand, seven hundred thirty-two and 28/100 ($34,732.28) dollars, together with legal interest thereon, from date of judicial demand until paid in full. All costs are to be paid by the defendants, Oliphint Enterprises LLC and United Fire & Indemnity Co.
AMENDED AND AFFIRMED .

The record is silent as to whether the Bosleys made any claim against their own homeowners' carrier.

Elsewhere in brief, United Fire argues that Thomas's meeting with Ms. Bosley, in late October 2011, "occurred less than thirty (30) days from satisfactory proof of loss," but this assertion is completely refuted by both Ms. Bosley's and by Thomas's testimony.

Until January 1, 2009, R.S. 22:1892 was designated as R.S. 22:658.

Burton v. Foret, supra ; Landry v. State Farm, supra ; Fuselier v. Louisiana Farm Bureau Mut. Ins. Co. , 458 So.2d 657 (La. App. 3 Cir. 1984).

The court's initial finding of no bad faith was plainly gratuitous, as bad faith is not part of the standard for a penalty under § 1892 B(1).