THIBODEAUX, Chief Judge, dissenting.
Discussion
Of great concern in this case is that, contrary to UNOCAL's assertions, the statute does not by any of its terms state that the responsible party is to perform the actual remediation, as will be discussed fully below. Act 312 requires only that the responsible party submit a remediation plan to the Department, fund the court's final plan, and file progress reports as the court or the Department may require. See La.R.S. 30:29(C)(1), (C)(5), and (F), respectively.
Upon adopting its final plan, the court orders the responsible party "to fund the implementation of the plan." La.R.S. 30:29(C)(5). Funds for the court's final plan are put in the registry of the court, and the court controls the funds. La.R.S. 30:29(D)(1) and (D)(4).
Pursuant to a de novo review, there are, in my view, trial court errors that require a reversal of its judgment. The errors arise in three main categories.
LDNR's Plan and Its Contingencies
While LDNR was thorough in comparing the plans submitted by UNOCAL and VPSB and in its efforts to assess the evidence from the parties' experts over a seven-day public hearing, the final plan submitted to the trial court contains far too many contingencies with no estimate of the cost of the contingencies. In short, the LDNR plan was incomplete; it repeatedly described more work that had to be done before remediation would be complete, including at least two years of monitoring, but the trial court did not require cost estimates on the additional work. As a result, no one knows, or even has a good estimate of, how much it will take to remediate the land to the level required to protect the public; and no one knows how long it will take to finish the remediation.
More specifically, LDNR's plan states as follows (emphasis added):
C. Cost Estimate to Implement Most Feasible Plan
The cost estimate to implement the Plan as presently known is $1,411,190 (rounded). This includes: 1) UNOCAL's estimate to close Tank Battery B, South Pit, which LDNR accepts; 2) UNOCAL's estimate for groundwater monitoring wells, which LDNR accepts; 3) estimate for SED 15 area remediation (Table 11); 3) [sic] estimate for sampling and excavation/disposal of mercury at Tank Battery A (Table 12); 4) estimate for resampling costs (Table 13); and 4) [sic] estimate for groundwater costs (Table 14). This estimate does not include additional well installationsthat may be necessary pursuant to this Plan; any additional evaluation costs that may be necessary from additional sampling and/or further delineation required by this Plan (beyond what is specifically covered in cost tables above); and/or any *1270 remediation costs that may be necessary based on results of sampling and/or further delineation. Additional costs will depend on what sampling and/or delineation reveals .
In LDNR's fifty-two-page plan (plus tables, charts, and graphs), there are over thirty contingencies, introduced by if-then phrases and phrases such as data incomplete, information inconclusive, unclear, not established, further evaluation or remediation needed . There were at least a dozen instances of requirements for UNOCAL to submit work plans, or report results and further evaluation or remediation needed, or create AOI (area of interest) figures, or meet with LDEQ in the future. There were four instances of additional wells that may be necessary, and two locations requiring semi-annual monitoring for two years .
Under Act 312, the trial court can accept the funding in increments, but not without requiring the defendant to post bond for the full cost of remediation. The trial court did not require a bond and accepted only the known costs associated with the LDNR plan as submitted. When VPSB asked questions about the contingencies and other unclear sections after the LDNR plan was submitted to the court, the LDNR supplied answers that clarified some of those contingencies, but the trial court refused to incorporate the clarifying text, except for one $329,000.00 correction, before adopting the court's final plan for implementation.
More specifically, VPSB's question number 16, and LDNR's response provided as follows:
16. Q. Table 12-mercury excavation costs-Table 12 identifies a figure of $11,040,00 for the excavation of mercury in a 20'x20x3' area. The calculations at the bottom of the table identify a 44 cubic yard volume, which purportedly translates to 6.9 bbls of material, which appears to be inaccurate. The actual barrel volume would appear to be 213 bbls. If a bulking factor of 2 is included (as in the prior LDNR calculation), the true cost of the mercury excavation would appear to be $340,000.
A. The panel agrees the cost calculation for mercury excavation cost is incorrect, and VPSB's calculation is correct. This clarification here may be viewed as a sufficient correction to the MFP & Reasons on this point unless either party requests the issuance of a revised Table 12 and other page(s) incorporating the incorrect [sic] figure, which of course will be done if requested.
Based upon the foregoing $329,000.00 mistake, it is reasonable that VPSB had other concerns regarding the LDNR plan, particularly where the plan has UNOCAL, who apparently has not had a lease for oil and gas exploration on the property since 1995, in charge of all the contingencies. Of VPSB's twenty-seven questions, answer number 16 above is the only one that was incorporated into the final judgment and reflected in the final cost estimate in the judgment, changing the LDNR plan's estimate of $1.4 million to the trial court's judgment requiring a deposit of $1.7 million. Other examples of significant questions follow, and the bolded emphasis in the LDNR's answers indicates that the clarification was needed and is important to the accuracy of the final judgment implementing the plan.
7. Q. Does this plan require any institutional controls or conveyance notices?A. No. Institutional controls or conveyance notices are not required at this time. It is not known whether or not institutional controls or conveyance notices will be necessary until site evaluation is complete, all COC's are fully delineated and UNOCAL submits its *1271 plan(s) to address any outstanding compliance issues .
8. Q. Does this plan allow Unocal to inject contaminated groundwater under the VPSB property without a surface lease and over the VPSB's objection? Or is DNR considering onsite injection on adjacent property in the same field?
A. No. This has not been determined yet . Prior to making any determination, further characterization and delineation is needed[.]
9. Q. The DNR plan says "oil sheening clearly violates LDEQ general surface water quality criteria as to aesthetics, color, floating, suspended, and settleable solids, and oil and grease." Does this plan require cleanup of all oil sheens on the property? Or does it just require cleanup of oil sheens generated in the SED-15 area? See pgs. 27-28.
A. If there is obvious sheening at other locations besides SED-15, the source of the sheening must be cleaned up in an appropriate manner similar to SED-15 .
....
22. Q. Pg. 44-45-It is unclear as to what CDCs are being evaluated in this zone. The plan mentions barium, benzene, and chlorides. Is Unocal also required to look at other contaminants that exist above the applicable standards (i.e., selenium, strontium, TPH, chromium, lead)? Numerous samples appear to have concentrations above applicable limits (e.g., SB-1, HPNIPA-08-T, TBBIS, MPA04T, etc.).
A. The MFP & Reasons in this 40-50 foot zone only addressed barium, benzene, and chlorides . The panel clarifies that other COCs with exceedances must be characterized, delineated, and be part of a plan of remediation ....
This particular clarifying answer continues for another eleven lines of explanation. Note also the following:
25. Q. Are concentrations at BC-3 and BC-4 (which had heavy metals and chlorides ) required to be delineated?
A. Although the MFP & Reasons, pp. 49-50, dealing with BC-3 and BC-4, specifically refers to iron, barium, strontium, and radium, and the reference "other COCs" is not used , the same comment as in No. 24 applies here. The panel clarifies that other COCs with exceedances at BC-3 and BC-4 must be characterized, delineated, and be part of a plan of remediation as necessary and in accordance with RECAP . Radium, and potentially strontium, is exclusively within the jurisdiction of LDEQ, as noted in the Radium section of the MFP & Reasons.
The last two questions answered by LDNR specifically leave the contingencies up to the "judgment of UNOCAL."
26. Q. Footnote 155, pg 49, states that "the SWD's should be investigated as a possible source of benzene." What COC's is Unocal required to delineate with respect to the SWD breaches?
A. Based on information reported to the agency at this time, the panel has suggested UNOCAL should investigate the SWDs as a potential source of benzene. The first step should be gathering more data to determine if the limited benzene exceedance information from BC-2 can be repeated/verified, and if the exceedance is, or appears to be present in aquifer at this sample location. Beyond benzene, any other COCs that are helpful for purposes of determining whether a breach in a SWD is a source of the benzene in the aquifer is left to the judgment of UNOCAL at this point . Any plan for investigation should be submitted to LDNR for review *1272 in accordance with applicable protocol for compliance with RECAP and/or Office of Conservation regulations prior to implementing any such plan. This Office will implement appropriate action should additional information submitted to the agency necessitate further investigation by UNOCAL.
27. Q. How is Unocal to go about investigating the SWD's? Should they be required to re-enter the SWD's to determine mechanical integrity of the well bores?
A. Whether, or how, UNOCAL investigates the SWDs is left up to the judgment of UNOCAL at this time . However, any plan for investigation should be submitted to LDNR for review in accordance with applicable protocol for compliance with RECAP and/or Office of Conservation regulations prior to implementing any such plan. This Office will implement appropriate action should additional information submitted to the agency necessitate further investigation by UNOCAL.
Ultimately, VPSB agreed to the LDNR plan for ultimate remediation of VPSB's property; however, VPSB at least wanted LDNR's clarifying answers on the contingencies incorporated into the final plan adopted by the trial court.[13] I agree with VPSB. Based upon a de novo review, a preponderance of the evidence shows that the better plan for the protection of the public is the one that complies in every respect with Act 312 and ensures that all questionable areas are revealed and addressed.
In Sweet Lake Land & Oil Co. v. Oleum Operating Co., L.C. , 17-464, p. 2 (La.App. 3 Cir. 10/18/17), 229 So.3d 993, 996, writ denied , 17-1107 (La. 10/27/17), 228 So.3d 1224, this court upheld the trial court's rejection of LDNR's plan as incomplete for purposes of remediation. There, in rejecting the plan, the trial court specifically ordered LDNR, in pertinent part, to:
a. address groundwater remediation on the property .... The final remediation plan may contain clean up options that depend upon the results of additional information and should be accompanied by an estimate of the cost to obtain the additional information. If LDNR is unable to provide the foregoing final remediation plan, it shall provide the Court with information to help the Court better order LDNR to do what needs to be done;
b. Specify the regulation or standard for each clean up activity so that the Court can enforce it[.]
In affirming the trial court, even though an amended version of Act 312 in Sweet Lake provided for a preliminary plan before LDNR's final submission to the trial court, which the original version controlling this case does not, we determined that the LDNR plan, when submitted to the trial court, is final when submitted, and must be complete. We stated that under the explicit terms of the statute, "the role of LDNR is to develop the most feasible plan and file the plan in the court record, while the role of the trial court is to adopt the plan unless evidence supports otherwise." Sweet Lake , 229 So.3d at 1001. We further stated:
[T]he supreme court in M.J. Farms, Ltd. v. Exxon Mobil Corp. , 07-2371, pp. 37-38 (La. 7/1/08), 998 So.2d 16, 32, stated in dicta : "Finally, it is the district court who considers the various restoration plans, including any that the surface owner may choose to submit, determines which one is most feasible, and oversees *1273 the implementation of the restoration plan. La.Rev.Stat. § 30:29(C)(5)." In State v. Louisiana Land and Exploration Co. , 12-884, p. 16 (La. 1/30/13), 110 So.3d 1038, 1049, the supreme court explained that "although the La. DNR has input into the plan to remediate the property, the final decision as to the remediation plan adopted rests with the court. Throughout the remediation process, the court remains the gatekeeper to ensure the purpose of the Act is accomplished-remediation of the property to the extent of the public's interest."
Id. at 1001-02.
In Sweet Lake , we stated that, in the hearing before LDNR, "although Sweet Lake apparently submitted a plan, there was no evidence, much less a preponderance of evidence, as to whether its plan was more feasible than LNDR's plan. During the hearing, the experts mainly testified regarding the flaws and proper interpretation of the LDNR plan." Id. at 1001. That is not the case here, and we are not requiring the court to fully reject the LDNR plan and send it back. In this case, the LDNR hearing lasted seven days, and the LDNR panel heard extensive testimony and received detailed exhibits from eight experts, five for UNOCAL and three for VPSB. LDNR provided detailed reasons over fifty-two pages, with 165 footnotes, as to what it found acceptable and unacceptable in each plan submitted. There was significant evidence available to LDNR, but LDNR still submitted a plan with many, many contingencies and no estimate of costs to cover them. The language in LDNR's plan itself and the twenty-seven questions and answers prove that there were too many unknowns to even suggest that the cost of the remediation would be the cost adopted by the trial court to implement the remediation plan.
Here, there were apparently two court hearings discussing the unknown contingencies, LDNR's answers, which LDNR admitted by letter were clarifications to its plan, and the content of the final judgment, before the trial court issued its final judgment on the plan it found most feasible. The most feasible plan will be the clearest, most specific, most accurate, and most complete plan reasonably available. See La.R.S. 29:30(I)(3). Thus, in this case I think that a preponderance of the evidence shows that, at the very least, the trial court should have incorporated as an addendum the twenty-seven questions and clarifying answers in evidence before adopting the LDNR plan as "the most feasible plan." I further conclude no merit in UNOCAL's argument that VPSB had to request an additional "preponderance hearing" as neither the reference nor the requirement appears in the language of the statute.
The Trial Court's Judgment
Both VPSB and UNOCAL submitted proposed final judgments for consideration by the trial court. Following a September 2016 hearing, the trial court ordered the parties to try to agree on a final judgment. They could not reach agreement. During the November 2016 hearing on the content of the judgment, the trial court adopted, in large part, the judgment drafted by the defendant, UNOCAL, the party found liable by a jury for environmental contamination of the property during the fifty-five years that it had operated oil and gas exploration thereon, from 1940 to 1995. The judgment adopted by the trial court, over repeated objections by VPSB, in some paragraphs implies that the cost to implement the Most Feasible Plan is the known costs of roughly $1.7 million.
One paragraph states that "the cost estimate to implement the Most Feasible Plan as presently known is $1,740,150.00 *1274 (rounded)." It is true that this language is based upon the first sentence of the paragraph near the end of LDNR's plan at section C, entitled, "Cost Estimate to Implement the Most Feasible Plan" as shown in full above and discussed early on in this opinion. The mathematical error has been corrected in the final judgment. But the next sentence which begins, "This includes," and the remainder of the paragraph wherein LDNR explains what is captured in the cost estimate and what is not captured in the estimate is omitted. This was a very contentious point at the November hearing on the judgment, and yet the trial court accepted UNOCAL's proposed judgment omitting specifics that LDNR clearly thought necessary to include in its plan.
The next paragraph in the trial court's judgment, states that "pursuant to La.R.S. 30:29(C)(5) and (6)(a), UNOCAL shall fund the implementation of the Most Feasible Plan by depositing ... $1,740,150.00 ... into the registry of the court[.]" Act 312 at La.R.S. 30:29(C)(5) does require the court to order the responsible party "to fund the implementation of the plan." But (C)(5) does not instruct the court to order the responsible party "to fund the implementation of the plan by depositing " any amount, much less only part of the cost of a plan riddled with contingencies and a plan which states by its own terms that the estimate of $1,740,150.00 does not cover specific contingencies (emphasis added):
This estimate does not include additional wellinstallations that may be necessary pursuant to this Plan; any additional evaluation costs that may be necessary from additional sampling and/or further delineation required by this Plan (beyond what is specifically covered in cost tables above); and/or any remediation costs that may be necessary based on results of sampling and/or further delineation. Additional costs will depend on what sampling and/or delineation reveals .
In addition to adding language that is not part of (C)(5), such that the sentence implies that the amount stated will fully implement the plan, the sentence also references (C)(6)(a), which states that the judgment is final. This reinforces the implication, in one sentence, that the deposited amount will fund the plan and that this is the court's final judgment on the matter. Since there are six more paragraphs to the court's judgment, the last of which appropriately references La.R.S. 30:29(C)(6)(a), it begs the question: why the placement of (C)(6)(a) regarding finality of the judgment in an early paragraph where it has no easily discernible meaning, except to imply finality to an amount that clearly is not final?
In fact, the statute itself anticipates that a defendant's initial deposit into the registry of the court may not be enough to fully fund remediation of the subject property, and the statute provides for additional funds to be deposited. More specifically:
The court shall retain jurisdiction over the funds deposited and the party or parties admitting responsibility or the party or parties found legally responsible by the court until such time as the evaluation or remediation is completed. If the court finds the amount of the initial deposit insufficient to complete the evaluation or remediation, the court shall, on the motion of any party or on its own motion, order the party or parties admitting responsibility or found legally responsible by the court to deposit additional funds into the registry of the court. Upon completion of the evaluation or remediation, the court shall order any funds remaining in the registry of the court to be returned to the depositor. The department and the parties shall *1275 notify the court of the completion of any evaluation or remediation.
La.R.S. 30:29(D)(4).
Following the previously discussed problematic paragraphs of the trial court's judgment, the next paragraph dealing with (D)(4), quoted immediately above, was highly contested at the hearing on the judgment. This was because the trial court would not allow VPSB's use of the phrase "initial deposit" in the sentence specifically referencing (D)(4) two times in the sentence. The trial court's paragraph stated that, "pursuant to La.R.S. 30:29(D)(4), if the court finds that the deposited amount ($1,740,150.00) is not sufficient to fund the implementation of the Most Feasible Plan, the court shall ... order UNOCAL to deposit additional funds into the registry of the Court in accordance with La.R.S. 30:29(D)(4)." The collective effect of the above discussed additions to, deletions from, and misplaced references to, the statutory language of Act 312 of 2006, contained in the trial court's judgment, is a final judgment that will propagate needless litigation in the future. This is particularly true where full remediation is at least two years away.
The VPSB judgment appearing in the record on pages 545-548, filed on October 19, 2016, as "Exhibit A" to VPSB's "Memorandum in Support of Motion to Adopt VPSB's Proposed Form of Judgment Regarding Most Feasible Plan" most accurately reflects the language and intent of the LDNR plan and the language and intent of La.R.S. 30:29. Accordingly, the VPSB judgment should have been accepted in its entirety, except for the minor clarifying revisions shown below.
The first revision clarifies how the VPSB questions and LDNR's letter and answers discussed above will be incorporated into the LDNR plan. Since a seamless incorporation of the answers into the original text of the plan will likely invite more litigation over the re-wording, I conclude that an addendum of the letter and the questions and answers is the most efficient and accurate way to incorporate them into the final plan adopted by the court. To that end, VPSB's judgment, on page two, in the paragraph addressing the "September 2, 2016 letter" and the questions and answers, should add the words "by Addendum" inserted after the existing words "will be incorporated."
The next clarification is in the first full paragraph on page three of VPSB's proposed judgment. The reference to " La.R.S. 30:29(D)(1)" should instead be " La.R.S. 30:29(D)." The third full paragraph on page three should end with ", pursuant to La.R.S. 30:29(D)(3)." The fourth full paragraph should end with ", pursuant to La.R.S. 30:29(D)(4)." The fifth full paragraph should end with ", pursuant to La.R.S. 30:29(F)." The sixth full paragraph on page three should end with ", pursuant to La.R.S. 30:29(D)(4)." The first paragraph on page four should delete "is obligated to" and insert "shall" in its place, for reasons more fully discussed below.
Actual Performance of the Remediation Work
The trial court accepted UNOCAL's argument that Act 312 not only required UNOCAL to fund the remediation, but it also required UNOCAL to actually perform the remediation work on the property. That is a false assertion. Act 312, enacted as La.R.S. 30:29 on June 8, 2006, does not specify who must do the work. The cases cited by UNOCAL involved current operators and leaseholders who were operating on the subject property under leases they had paid for. Moreover, none of those cases held that Act 312 required the responsible party to perform the remediation work. In this case UNOCAL has no lease, and it has no incentive to remediate the property on any timetable except its own;
*1276 nor does it have an incentive to readily comply with LDNR's requirements without arguing every point.
Where UNOCAL has no interest in the property and stands to recover unused funds from its deposits into the registry, its primary business incentive will be to spend as little as possible, argue against every requirement to deposit more money, and find ways to get as much refunded from the registry as possible. It was not the intent of the Act or the legislature to require a defendant, especially one in UNOCAL's position, to perform the actual remediation work. In fact, the 308-page hearing transcript of May 17, 2006, wherein testimony regarding Senate Bill 655 (Act 312) was given before the Natural Resources Committee, contains no argument over language requiring a particular party to do the actual work-because such language was not in the bill. There were many arguments, as testimony was given by landowners, oil companies, LDNR, lawyers, and environmental engineers. There were arguments about technical requirements, applicable standards, the role of the courts; and some discussions contained comments such as "make them [the oil companies] clean up their messes" or "require them [the landowners] to use their court awards to clean up their property." But none of those comments or arguments were about language requiring the wrong party, or any party, to actually perform the remediation work.
In this case, VPSB has the greater incentive to quickly remediate its property because it is losing money every day the contamination exists. That is in part because VPSB is having to cancel the hunting and fishing leases that it has issued to its paying leaseholders. While the 2006 legislature did not state which party should perform the remediation work, VPSB argues that the Louisiana Supreme Court places that obligation on the landowner. VPSB cites language from an earlier appeal in this case, wherein the supreme court affirmed this court's findings that Act 312 does not cap the landowner's damages to the limited remediation to state agency standards when the landowner's lease with the oil company provides for a higher remediation standard. It is the supreme court's most recent and most in-depth decision on the statute. The supreme court starts with the rules of legislative interpretation, which are certainly applicable herein:
When there is long-standing interpretation of a legal issue or several laws on a particular subject matter, we must also give due regard to the well-settled rules of statutory construction succinctly set forth in M.J. Farms, Ltd. v. Exxon Mobil Corp. , 2007-2371, p. 13-14 (La.7/1/08), 998 So.2d 16, 27 :
It is also well established that the Legislature is presumed to enact each statute with deliberation and with full knowledge of all existing laws on the same subject. [State v. ] Johnson , [2003-2993 (La.10/19/04),] 884 So.2d [568] at 576 ; State v. Campbell , 03-3035 (La.7/6/04), 877 So.2d 112, 117. Thus, legislative language will be interpreted on the assumption the Legislature was aware of existing statutes, well established principles of statutory construction and with knowledge of the effect of their acts and a purpose in view. Johnson , 884 So.2d at 576-77 ; Campbell , 877 So.2d at 117. It is equally well settled under our rules of statutory construction, where it is possible, courts have a duty in the interpretation of a statute to adopt a construction which harmonizes and reconciles it with other provisions dealing with the same subject matter. La. Civ.Code art. 13 ;
*1277 City of New Orleans v. Louisiana Assessors' Retirement and Relief Fund , 05-2548, 986 So.2d 1 (La.10/1/07).
State v. Louisiana Land & Expl. Co. , 12-884, p. 9 (La. 1/30/13), 110 So.3d 1038, 1045.
The court then gave a history leading to Act 312 in 2006 and the purpose of La.R.S. 30:29 by discussing its 2003 decision in Corbello v. Iowa Production , 02-826 (La. 2/25/03), 850 So.2d 686. There, the landowner was awarded $33 million in damages against the former mineral lessee for unauthorized disposal of saltwater and the poor condition of the property. In affirming, the supreme court articulated:
A large part of the damages plaintiffs recovered were for restoration of groundwater damage which threatened the Chicot Aquifer, the source of drinking water for Lake Charles, Louisiana. In this court, the mineral lessee argued the appellate court's affirmance of this award to plaintiffs for what is strictly an alleged public injury was error, where the plaintiffs had no legal duty to use the award to restore the property. We found the contamination of the groundwater was both a public injury and a private injury, which would not prevent plaintiffs from collecting damages. [Corbello ] 850 So.2d at 699.
We noted the legislature had not implemented "a procedure to ensure that landowners will in fact use the money to clean the property." Id. We recognized the two opposing public policy concerns which the then-existing state of the law created. At that time, a landowner suing for remediation of contaminated land could sue and receive remediation damages yet, was under no obligation to use the damage award to restore the property. At the same time, there was a strong possibility that land would remain polluted if landowners could not bring suit for remediation. Id. [at] 701.
Corbello was decided in February of 2003. The legislature responded in the 2003 legislative session by enacting La. R.S. 30:2015.1, effective July 2, 2003, which set forth procedures for the remediation of usable groundwater in the public's interest. In 2006, the legislature extended its remediation procedures into other environmental media by enacting Act 312, which established a procedure to ensure the remediation of oilfield sites and exploration and production sites in La. R.S. 30:29. We now turn to the provisions of the statute at issue and its interpretation.
Interpretation of La. R.S. 30:29
In Corbello , we observed plaintiffs who were awarded remediation damages were under no statutory obligation to perform remediation work. The purpose of Act 312 was to create such an obligation.
Louisiana Land & Expl. Co. , 110 So.3d at 1048 (emphasis added).
This last paragraph contains the language on which VPSB relies for its position that the supreme court interprets the statute as placing an obligation on the landowner to perform the remediation work called for in the Most Feasible Plan. I certainly find this argument persuasive, not only because of the italicized language, but because of the supreme court's language and reasoning throughout the opinion. However, we need not reach the question of whether the supreme court intended a narrow interpretation of the statute or a broad interpretation of the statute. In this case, where UNOCAL has no interest in the property, and, as VPSB points out, no employees of its own, the party with the most interest in getting the remediation accomplished in a timely manner, which is the purpose of Act 312, should be allowed to hire its own contractors to do the work. This is particularly true where this state is subject to hurricanes *1278 and tropical storms that fling contamination far beyond its source, to the further detriment of the public health, as pointed out in the testimony at the hearing on the senate bill. In this case, that party is clearly VPSB.
Because the trial court accepted UNOCAL's interpretation of the statute as requiring the responsible party to perform the actual remediation work, and because the statute contains no such requirement, the trial court's judgment is in error. I would reverse the judgment as to form and content and revise it to conform with the observations contained herein.
I respectfully dissent.

The majority adopts the trial court's rationale that the questions and answers "clarify the most feasible plan." It stops short of saying that they are incorporated into the final plan.